UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

LOUIS R. ANEMONE,

                              Plaintiff,

              -against-

METROPOLITAN TRANSPORTATION
AUTHORITY, PETER S. KALIKOW,
KATHERINE N. LAPP, GARY J. DELLAVERSON,
and MATTHEW D. SANSVERIE,

                              Defendants.

-----------------------------------------------------------x

**JUDGE MUKASEY**

**05 CV 3170**

**COMPLAINT**
**JURY TRIAL DEMANDED**



RECEIVED MAR 24 2005 U.S.D.C. S.D.N.Y. CASHIERS

       Plaintiff Louis R. Anemone, by his attorneys, Emery Celli Brinckerhoff & Abady LLP, as and for his complaint alleges as follows:

## INTRODUCTION

       1.     This is a civil rights action seeking damages for defendants' violations of plaintiff's rights, privileges, and immunities under the United States Constitution, as amended, and the Civil Rights Act of 1871, 42 U.S.C. § 1983, the New York State Constitution and New York law.

       2.     This is a case about defendants' systematic and unlawful abuse of power. Defendants publicly ridiculed and fired Mr. Anemone because he had the integrity and temerity to investigate and expose endemic corruption at the Metropolitan Transportation Authority ("MTA"). Before being discharged and having his stellar reputation sullied by defendants in the press, thus ruining his distinguished career, Mr. Anemone was the Deputy Executive Director of

Security at the MTA. Mr. Anemone brought 34 years of law enforcement expertise and innovation to his position with the MTA. Using that expertise, he uncovered serious and pervasive corruption within the upper echelon of the MTA and among MTA contractors. Many of Mr. Anemone's discoveries have led to indictments and convictions, shining a light on the extensive involvement of organized crime in contracts with the MTA. Instead of being honored for his exemplary service, Mr. Anemone was severely punished and defamed–all because he refused to stand by while others at the MTA turned a blind eye to the corruption that permeated every level of the agency.

## JURISDICTION AND VENUE

3.      The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343, 1367(a), and the doctrine of supplemental jurisdiction.

4.      The acts complained of occurred in the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

5.      Plaintiff demands a trial by jury in this action.

## PARTIES

6.      Plaintiff Louis Anemone is a citizen of the United States. From December 10, 2001 to May 8, 2003, Mr. Anemone was employed as Deputy Executive Director/Security for the Metropolitan Transportation Authority ("MTA").

7.      Defendant MTA is a public authority organized and existing under the laws of the State of New York. At all times relevant hereto, defendant MTA was responsible for

the policy, practice, supervision, implementation, and conduct of all matters concerning employees of the MTA.

8. At all times relevant to this complaint, Peter S. Kalikow was the Chairman of the MTA and, as such, was a policy-maker with respect to policies, practices, and customs of the MTA, including the MTA's employment practices. Defendant Kalikow's principal place of business is 347 Madison Avenue, New York, New York, 10017. Kalikow is sued in his individual and official capacities.

9. At all times relevant to this complaint, Katherine Lapp ("Lapp") was the Executive Director of the MTA, and, as such, was a policy-maker with respect to policies, practices and customs of the MTA. Defendant Lapp was the direct supervisor of Mr. Anemone during his term of employment with the MTA. Defendant Lapp's principal place of business is 347 Madison Avenue, New York, New York 10017. Lapp is sued in her individual and official capacities.

10. At all times relevant to this complaint, Gary J. Dellaverson ("Dellaverson") was the Deputy Executive Director/Labor Relations of the MTA, and, as such, was a policy-maker with respect to policies, practices and customs of the MTA. Dellaverson's principal place of business is 347 Madison Avenue, New York, New York 10017. Dellaverson is sued in his individual and official capacities.

11. At all times relevant to this complaint, defendant Matthew D. Sansverie ("Sansverie") was the Inspector General of the MTA and, as such, was a policy-maker with respect to policies, practices and customs of the Inspector General of the MTA. Defendant

Sansverie's principal place of business is 111 West 40th Street, New York, New York, 10018. Sansverie is sued in his individual and official capacities.

## FACTS

I.  **Background**

13. In December 2001, just over two months after the World Trade Center attacks, plaintiff Louis Anemone was hired by the Metropolitan Transportation Authority to be the Deputy Executive Director of Security.

13. Mr. Anemone came to the position at the MTA after 34 years of exemplary service as a law enforcement officer with the New York Police Department ("NYPD"), where he began as a police officer trainee in 1964 and rose quickly and steadily through the ranks, serving as a precinct commander, a narcotics commander, and a planning and training specialist. In 1995, Mr. Anemone was named Chief of Department, the highest ranking uniform police officer in the NYPD.

14. During his tenure at the NYPD, Mr. Anemone developed and implemented a number of innovative law enforcement techniques and systems. For example, Mr. Anemone developed the NYPD's Emergency Mobilization and Civil Disorder protocols, played a major role in the development of the much-lauded Compstat system (a crime tracking and prevention strategy that is widely viewed as having reduced major crime in the City by 50% since 1993), and developed the Citywide Security and Assessment Plan (a counterterrorism plan for the City's police department).

15. His innovation and executive skills were matched by his bravery and ability to manage crises. During the first World Trade Center bombing in 1993, Mr. Anemone

personally coordinated and directed the NYPD's rescue missions, which required him to orchestrate and direct over 40 helicopter landings to rescue individuals trapped on the roof of the World Trade Center.

16. Mr. Anemone's service to the City of New York has rightfully earned him a long list of accolades and honors. Mr. Anemone was named "Man of the Year" by the NYPD Columbia Association in 1995, and again by the Michael Buczek Foundation in 1997; and in 1999, he was the recipient of an Achievement Award from the Brooklyn Law School.

17. In 1999, Mr. Anemone retired as Chief of Department.

18. Directly following the terrorist attack of September 11, 2001, Governor Pataki appointed Mr. Anemone to the position of Deputy Director of the Governor's Office of Public Security.

19. Soon after that appointment, in December, 2001, Mr. Anemone was appointed to Director of Security of the MTA. Governor Pataki described Mr. Anemone as a "top notch police professional with a distinguished career who will help safeguard our subways, busses, commuter railroads, bridges and tunnels . . . [a]ll New Yorkers will benefit from his experience."

20. As the MTA's Director of Security, Mr. Anemone assumed full responsibility for all aspects of security for the MTA's entire infrastructure. This extraordinary undertaking required (i) supervision of the operations of the MTA police and the Staten Island Railroad Police, (ii) coordination of the national guards and MTA personnel posted at bridges and tunnels throughout the metropolitan area, (iii) coordination of security provided by the NYPD's Transportation Bureau, (iv) oversight of the activities of the security departments of

Metro North, Long Island Railroad, and New York City Transit, and (vi) organization of MTA consultants and employees to develop security projects acceptable to the Federal Emergency Management Agency.

21. To assist him with his duties, and specifically with security of MTA infrastructure, in January 2002 Mr. Anemone hired a NYPD, first-grade detective Nicholas Casale, as his Deputy Director.

22. Under Mr. Anemone's direction, in the winter of 2001-2002 Mr. Casale developed a comprehensive security plan for the MTA, one aspect of which was the Joint Infrastructure Task Force ("JITF"). Once in place, the JITF would provide a quick response unit for the MTA for all security breaches, an investigation unit to pursue security lapses on MTA property, a database of suspicious persons and incidents, and a training program for all MTA employees and security personnel.

23. In March 2002, Mr. Anemone and Mr. Casale held a meeting at which they presented plans for the JITF to defendant Dellaverson. At that meeting, defendant Dellaverson expressed his full support for the creation of the JITF. Subsequently, Mr. Anemone briefed defendants Lapp and Kalikow on plans for the JITF, and received their approval to begin operations and have the unit housed in offices at 2 Broadway, New York, New York.

24. The MTA had leased substantial space in 2 Broadway in 1998, and by 2002 was in the process of an extensive renovation of the space.

25. Over the course of 2002 and 2003, Mr. Anemone -- and ultimately the entire world -- would learn that the renovation of 2 Broadway occasioned grievous criminal corruption by certain MTA officials and contractors, numerous ethical breaches, woefully inept

management, and a complete failure of oversight by MTA officials – all of which resulted in a budget overrun of more than 100 million dollars.

26. As explained in detail below, Mr. Anemone undertook to investigate and expose the corruption at 2 Broadway, and other MTA locations. Defendants rewarded Mr. Anemone for his efforts by repeatedly defaming him in the press, utilizing the MTA's Inspector General's Office to conduct a baseless inquisition, suspending him from duty, and, finally, terminating him.

II. **Mismanagement and Corruption at 2 Broadway**

27. In July 1998, the MTA entered a 49 year lease agreement with Zar Realty for 1,600,000 square feet of office space in 2 Broadway. Upon information and belief, the lease agreement provided that many of the renovations would be paid for and managed by Zar Realty.

28. On information and belief, by late 1998, relations between Zar Realty owner Tamir Sapir and the MTA had completely deteriorated. Attorney John B. Wood, who had represented the MTA in lease negotiations, and who continued to represent the MTA in its dealings with Zar Realty, subsequently fired Sapir as its contractor and hired Sapir's former deputy, Frederick Contini, to assume responsibility as the developer at 2 Broadway. In December 2000 Mr. Sapir filed claims against the MTA for breach of contract, propelling the mismanagement of the 2 Broadway renovations -- and the extraordinary cost overruns -- into local headlines.

29. Meanwhile, by the time Mr. Anemone was appointed in December 2001, federal investigators in the Eastern District of New York were targeting Contini and a number of union officials who had been involved in the renovations at 2 Broadway in a massive

racketeering and corruption scheme that had cost the MTA millions of dollars from over billing, fraudulent payments, and bribes. Although this investigation was not yet public, upon information and belief, defendants Kalikow, Lapp, Sansverie and Dellaverson had full knowledge of the investigation.

### A. January - December 2002: Mr. Anemone Uncovers Additional Corruption at 2 Broadway

30. Against this backdrop of law suits alleging gross mismanagement and federal criminal investigations, Mr. Anemone began the process of overseeing the renovations of the JITF's new offices at 2 Broadway. What he discovered was that the corruption involving Contini – already under investigation by federal prosecutors – was only the tip of the iceberg.

31. In March 2002, Mr. Anemone hired Jay Geller ("Geller") of Geller Alarms to install security systems in the new JITF offices. Based on conversations with MTA officials, Mr. Anemone understood that Mr. Geller was in charge of security alarm installations for all MTA offices.

32. After installing the alarm system in the 2 Broadway offices, Geller submitted a bill for services to Mr. Casale. Upon review of the bill, Mr. Casale believed that the charges were grossly inflated, and raised this issue with Mr. Anemone, who in turn asked Mr. Casale to investigate the matter further.

33. In late April of 2002, Mr. Casale asked Geller to provide a more complete explanation of the bill. During a meeting with Mr. Casale, Mr. Geller reportedly stated that the bill was indeed inflated, but that it reflected the routine billing practices of contractors retained by the MTA. Mr. Geller also stated that the MTA Director of Facility Management, Howard

Weissman ("Weissman"), was aware that bill inflation was common among MTA contractors. Mr. Casale reported this conversation to Mr. Anemone.

34. After learning the details of Mr. Casale's conversation with Mr. Geller, Mr. Anemone became extremely concerned. Corruption among MTA contractors raised serious security issues as they are granted access to secure portions of MTA infrastructure and are privy to confidential information regarding the operations of the MTA.

35. Accordingly, one of Mr. Anemone's first investigative efforts as Deputy Executive Director of Security was to begin gathering information regarding various contractors who worked with the MTA.

### (1) *Howard Weissman & I-Lite*

36. In late April 2002, following up on Geller's statement that Howard Weissman was aware of contractors' bill inflation on MTA construction projects, Mr. Anemone began a review of bills approved by Weissman and his deputy Ronald Allan ("Allan"). What emerged was a pattern of special preference to certain contractors, authorization of obviously inflated bills and cost overruns, and guarantees of expeditious payment. With a little more investigation, it also became clear that Weissman and Allan had received significant bribes and kickbacks for their "special handling" of contractors bills.

37. While reviewing Weissman's records, Mr. Anemone initially focused his attention on I-Lite Electric LLC, an electrical contractor. Evidence demonstrated that I-Lite and its principals had submitted fraudulent and inflated bills on a routine basis, and that Weissman had been instrumental in ushering those bills through the payment process. After gathering

substantial evidence of the arrangement between I-Lite and Weissman, in June 2002 Mr. Anemone brought the matter to the attention of the Manhattan District Attorneys' Office.

38. The investigation initiated and largely conducted by Mr. Anemone and Mr. Casale, revealed that I-Lite paid more than $100,000 in bribes to Mr. Weissman. In exchange for these bribes, Mr. Weissman overlooked grossly inflated bills submitted by I-Lite to the MTA, and steered MTA contracts to I-Lite.

39. As a direct consequence of Mr. Anemone's investigative leadership and information gathered concerning Mr. Weissman's dealings with various contractors, in December 2002, Weissman and Allan were terminated from their positions at the MTA.

40. In June 2003, the Manhattan District Attorney's office announced the guilty pleas of I-Lite principals. Under the terms of the plea agreement, I-Lite was required to pay $2,000,000 in restitution to the MTA.

### (2) *Figliolia Plumbing*

41. In August 2002, while Mr. Anemone was in the process of investigating I-Lite's fraudulent billing practices, defendant Dellaverson informed Mr. Anemone that Mark Shaw, the former Executive Director of the MTA, had expressed concern about the billing practices of Figliolia Plumbing, a New Jersey Plumbing company that had worked as a contractor on several MTA jobs. Thus, contemporaneous with his investigation of Weissman and I-Lite, Mr. Anemone, and his investigators, also began to review the bills and paperwork submitted by Figliolia in projects at 2 Broadway and other MTA offices.

42. What Mr. Anemone found was astounding levels of corruption and fraud that had cost the MTA and tax payers millions of dollars. Under Mr. Anemone's leadership, the

investigation of Figliolia revealed large scale fraud committed with the authorization and approval of Weissman and Allan, who received substantial bribes and kickbacks for their "services."

43.     In late 2002, Mr. Casale presented the fruits of the Figliolia investigation to the Manhattan District Attorney. The District Attorney continued and expanded the investigation.

44.     Just over a year later, in December 2003, Figliolia Plumbing and its principals, as well as Weissman, Allan, and Gary Weissbard, MTA Building Manager, were charged in a 116-count indictment with, *inter alia*, money laundering, bribery, tax evasion, criminal enterprise, and fraud.

45.     Since then, they have all pleaded guilty. The Figliolia's agreed to pay more than $6 million as restitution and Alex Figliolia, Sr. and Alex Figliolia, Jr. have been sentenced to prison terms.

**B.     Winter 2002-2003: Lapp Begins to Thwart Mr. Anemone's Investigations**

46.     By December 2002, the evidence of corruption and mismanagement at the MTA had reached epic proportions: (i) Frederick Contini had been indicted by federal prosecutors in April 2002 for corruption involving union officials and again in July 2002 for defrauding the MTA throughout the renovation of 2 Broadway; (ii) Weissman and Allan had been fired under charges of corruption and remained under investigation by federal prosecutors; (iii) Mr. Anemone had already generated considerable evidence of I-Lite's criminal corruption, and had presented that evidence to the Manhattan District Attorney's office; (iv) and evidence of

Figliolia's fraudulent scheme had also emerged, portending more indictments, and more bad press for the MTA.

47.     Additionally, throughout 2002, the steady flow of evidence of criminal breaches by MTA officials and contractors worked to the detriment of the MTA in the ongoing civil litigation with Tamir Sapir and Zar Realty. Sapir pointed to the MTA's corruption and bungling as support for his claim of mismanagement and breach of contract in his civil suit against the MTA. And in December 2002, with evidence of MTA corruption and mismanagement before it, the Supreme Court of New York denied the MTA's motion to make Zar Realty responsible for at least $120 million in cost overruns at 2 Broadway.

48.     In light of these events, in the Fall and Winter of 2002, criticism of the MTA's renovation of 2 Broadway had mounted in the press, as had evidence that MTA officials, especially defendants, were effectively asleep on the watch while their own employees, and a slew of contractors, routinely bilked the MTA and taxpayers.

49.     In the winter of 2002-2003, under the pressure of public outcry and in the face of the MTA's potential civil liability, defendants began to thwart and obstruct Mr. Anemone's investigations of corruption at 2 Broadway.

     **(1)** *Investigation of John B. Wood*

50.     In December of 2002, defendant Lapp closed down Mr. Anemone's investigation of the billing practices of John B. Wood, the attorney who negotiated the leasing of 2 Broadway on behalf of the MTA, and who had been retained to effectively oversee the very tense relations with Zar Realty.

51. Earlier in 2002, defendant Lapp had asked Mr. Anemone to take a "quiet look" at Wood. As part of this investigation, in December 2002 Mr. Anemone followed standard investigative procedures and requested Mr. Wood's bills from Mary Mahon, then-general counsel of the MTA.

52. In January of 2003, upon learning of Mr. Anemone's request for bills submitted by Wood to the MTA, defendant Lapp blocked the request. Defendant Lapp then demoted Mahon from her position as MTA General Counsel.

53. In or about January 2003, in a meeting with Mr. Anemone, Defendant Lapp told him that, in the future, all avenues of investigation would have to be determined and cleared by her.

54. On information and belief, by January 2003, defendant Lapp was wary of the political maelstrom that could result if Wood's involvement in the 2 Broadway renovation was given close scrutiny: Approximately 3 months after defendant Lapp closed down Mr. Anemone's investigation of Wood, the New York State Assembly Standing Committee on Corporations, Authorities, and Commissions ("the Assembly Committee") conducted its own investigation of the mismanagement of 2 Broadway renovations. That investigation – during which Wood, Sapir, and former MTA Chairman Virgil Conway testified – revealed that the mismanagement and corruption at 2 Broadway had gone unchecked in part because of the behind-the-scenes efforts of former Senator Alfonse D'Amato.

55. On May 16, 2003, Sapir testified that he had paid former Senator Alfonse D'Amato $500,000 to place a phone call to Conway to request prompt handling of the lease arrangement.

56. As a consequence of pressure from a highly influential political figure, Mr. Sapir was able to secure certain financial clearance that would have otherwise been unavailable.

57. When the news of Senator D'Amato's involvement in the 2 Broadway scandal became public, it captured headlines for months, exposing the MTA to a new round of criticism in the press.

     (2)  *Kenneth Bauer & Plasser-American*

58. In February 2003, soon after closing down Mr. Anemone's inquiry of attorney Wood, defendant Lapp also terminated Mr. Anemone's investigation of allegations of unethical conduct of Kenneth Bauer, then-President of the Long Island Railroad ("LIRR").

59. During an informal meeting held in the summer of 2002, defendant Dellaverson suggested to Mr. Anemone and Mr. Casale that Bauer had engaged in unethical conduct in his relations with a major railroad parts supplier and MTA contractor, Plasser-American Corporation. Defendant Dellaverson urged Mr. Anemone to look into the matter.

60. After a preliminary inquiry, Mr. Anemone determined that, in fact, there was good reason to question the propriety of Mr. Bauer's acceptance of exorbitant gifts and entertainment from Plasser-American representatives. Accordingly, Mr. Anemone launched an investigation of Plasser-American, asking Mr. Casale to conduct an initial investigation of Bauer's contacts with Plasser-American officials.

61. Over the course of several weeks, Mr. Casale discovered details of Bauer's trips to Austria (where Plasser-American is based), and his attendance at numerous extravagant social events with Plasser-American representatives. Mr. Casale also learned that Plasser-

American had previously been censured by Amtrak's Investigator General, and had pleaded guilty to federal wire fraud in 1999.

62. During the course of the investigation of Plasser-American, Mr. Anemone discovered that the MTA was evaluating a $1,700,000 bid by Plasser-American for a parts-replacement contract, and was scheduled to vote on that contract on February 27, 2003. Of the view that the vote on the pending Plasser-American bid should be delayed pending the conclusion of the investigation, Mr. Anemone met with defendant Lapp on February 26, 2003 and personally and informed her of the initial results of the investigation of Bauer and Plasser-American.

63. During the February 26th meeting, defendant Lapp instructed Mr. Anemone to cease the investigation of Mr. Bauer's contacts with Plasser-American, and stated that she planned to refer the investigation to the MTA's Inspector General's Office.

64. In compliance with defendant Lapp's instructions, Mr. Anemone instructed Mr. Casale to halt the investigation into Bauer's dealings with Plasser-American.

65. On February 27, 2003, at the MTA meeting, defendant Kalikow severely compromised and undermined any *real* investigation of Bauer or Plasser-American by announcing publicly that the vote on the Plasser-American would be suspended because of allegations that the company had breached ethics rules by wining and dining Bauer.

66. Approximately ten months later, in late December 2003, the MTA Inspector General's Office substantiated Mr. Anemone's allegations regarding the impropriety of Mr. Bauer's acceptance of gifts from Plasser-American officials.

### III. Retaliation Against Mr. Anemone

#### A. Investigation of Mr. Anemone and Mr. Casale

67. In late February 2003, defendants' efforts to thwart Mr. Anemone's investigation of corruption at the MTA turned hostile.

68. On February 28, an investigator from the MTA phoned Mr. Casale to ask him questions about the investigation. During that phone call, Mr. Casale informed the inspector that he had a "community source" for the allegations regarding Bauer. The next day, on February 29, 2003, the MTA Inspector General requested a deposition-style interview with Mr. Casale regarding the Plasser-American investigation and other matters.

69. Such a request for a formal interview with an MTA employee is highly unusual, and is not the typical method of transferring information from one investigative unit to another.

70. During his interview, which was held on March 26 and 28, 2003, Mr. Casale informed the investigators that his source for the initial information about Bauer was Gary Dellaverson.

71. On or about March 27, 2003 the Inspector General requested a formal interview with Mr. Anemone regarding the Plasser-American investigation. That interview was conducted on March 28, 2004.

72. During Mr. Anemone's interview, representatives from the Inspector General's office questioned him extensively regarding his involvement in the Plasser-American investigation, as well as his oversight of Mr. Casale. They asked few if any questions regarding

Mr. Anemone's knowledge of intelligence gathered with respect to Mr. Bauer's interactions with Plasser-American representatives.

73. Specifically, the Inspector General's office questioned Mr. Anemone extensively regarding whether Mr. Casale had truthfully reported the existence of a "confidential informant" for information about Bauer's contacts and dealings with Plasser-American Officials.

74. In answering these questions, Mr. Anemone explained that there had been a source for that information, and that he believed Mr. Casale had used the term "community source" in describing the source of the initial allegations regarding Bauer. Mr. Anemone also identified that source as defendant Dellaverson.

75. Mr. Anemone's interview with the Inspector General's Office was threatening and inquisitorial in tone, and sent a clear message to Mr. Anemone that future investigations that might prove embarrassing to the MTA would not be tolerated.

B.  **New York Times Interview and Mr. Anemone's Suspension**

76. Believing strongly that the investigation of MTA corruption should continue so that it could be properly addressed by law enforcement officials, Mr. Anemone pursued his only remaining option. On March 28, 2003, he met with Randy Kennedy and Bruce Lambert, two reporters from *The New York Times.*

77. During that interview, Mr. Anemone informed the reporters that top-level officials at the MTA had frustrated his staff's efforts to investigate corruption within the MTA and among MTA contractors by refusing to provide essential records regarding contracts and billing, by ordering him to stop certain investigations, and by holding inquisition-style interviews with him and his deputy, Mr. Casale. Mr. Anemone also expressed his view that security

throughout the MTA infrastructure had suffered from the lack of transparency in the MTA administration.

78. On Sunday, March 30, 2003, *The New York Times* published an article reporting many of Mr. Anemone's comments regarding the MTA's recalcitrance to investigate corruption within its ranks.

79. Over the next several days, Mr. Anemone's statements were reported in a variety of regional and national news papers. For example, a story published in *Newsday* on April 1, 2003 quotes Mr. Anemone as stating that "[MTA officials] are aware of the evidence in the DA's office of corruption here, with contractors ripping the place off." The *Newsday* story also quoted Mr. Anemone's statement that "[The MTA] have 35 years here in business and they haven't had someone from the outside take a good, hard look at them. Sunshine is the best disinfectant."

80. Mr. Anemone's statements to the press resulted in immediate and direct retaliation by MTA officials. On March 31, 2003, the day after publication of *The New York Times* article, defendant Sansverie sent what he described as an "Interim Report" to defendant Kalikow recommending the immediate suspension of Mr. Anemone ("Interim Report").

81. The Interim Report contained a litany of factual misrepresentations, distortions of statements made by various individuals, and a series of unfounded accusations. Most significantly, the Interim Report falsely stated that Mr. Anemone had made an "admission" during his interview with the MTA Inspector General's office that there had never been a "confidential informant" in the Plasser-American matter, and that Mr. Anemone had lied to Inspectors by "fabricating a confidential informant in order to accuse the former President of the

LIRR of misconduct." This allegation was false: Mr. Anemone named defendant Dellaverson as the source of the original lead regarding Bauer.

82. The Interim Report also accused Mr. Anemone of authorizing an investigation of Plasser-American against the direct command of his superior, defendant Lapp. This accusation was also false: Mr. Anemone terminated the investigation on February 26, 2003, directly after he met with defendant Lapp to inform her of the investigation.

83. On March 31, 2003, defendant Lapp informed Mr. Anemone that he would no longer report to her and should instead report to a fellow deputy director, defendant Dellaverson.

84. In addition, on March 31, 2003, defendant Dellaverson began an investigation of Mr. Anemone by requesting that Mr. Anemone provide information regarding his involvement in the retention of certain canine security companies and alleged interferences with certain investigations.

85. The following day, April 1, 2003, defendant Kalikow suspended Mr. Anemone, placing him on paid leave.

86. In conjunction with Mr. Anemone's suspension, the MTA issued a press release containing many of the allegations made in the Interim Report, and also released defendant Sansverie's Interim Report to the press, notwithstanding the fact that the report contained numerous factual errors and blatant falsehoods, and that Mr. Anemone had not been given an opportunity to respond or correct the allegations contained in the Interim Report.

87. Statements from the Interim Report and the press release were widely disseminated by the press. An April 2, 2003 *Newsday* story quoted the Interim Report's