```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
LOUIS R. ANEMONE,                 :
                                  :
              Plaintiff,          :   05 Civ. 3170 (MBM)
                                  :
    -against-                     :   OPINION & ORDER
                                  :
METROPOLITAN TRANSPORTATION       :
AUTHORITY, PETER S. KALIKOW,      :
KATHERINE N. LAPP, GARY J.        :
DELLAVERSON and MATTHEW D.        :
SANSVERIE,                        :
                                  :
              Defendants.         :
----------------------------------X
```

APPEARANCES:

MATTHEW D. BRINCKERHOFF, ESQ.
O. ANDREW F. WILSON, ESQ.
(Attorneys for plaintiff)
Emery Celli Brinkerhoff & Abady LLP
545 Madison Avenue
3rd Floor
New York, NY 10022
(212) 763-5000

LOUIS PECHMAN, ESQ.
(Attorney for defendant Matthew D. Sansverie)
Berke-Weiss & Pechman LLP
488 Madison Avenue
11th Floor
New York, NY 10022
(212) 583-9500

MICHAEL B. MUKASEY, U.S.D.J.

Plaintiff Louis R. Anemone sues the Metropolitan Transportation Authority ("MTA") and individual defendants Peter S. Kalikow, Katherine N. Lapp, Gary J. Dellaverson, and Matthew D. Sansverie in their individual and official capacities under 42 U.S.C. § 1983 (2000) for violations of free speech and due process rights secured by the First and Fourteenth Amendments of the United States Constitution.  Anemone also asserts free speech and due process claims against all defendants under the New York State Constitution and a claim against defendant MTA under New York Civil Service Law § 75-b (McKinney 1999 & Supp. 2005). Defendant Sansverie moves to dismiss all of the federal and state constitutional claims against him pursuant to Fed. R. Civ. P. 12(b)(6).[1]  For the reasons set forth below, defendant's motion to dismiss is granted in part and denied in part.


I.

The following facts are drawn from plaintiff's complaint and are accepted as true for the purposes of defendant's motion to dismiss.

In December 2001, the MTA hired Anemone, a 34-year veteran of the New York Police Department ("NYPD"), to serve as

---

[1]     Defendants MTA, Kalikow, Lapp, and Dellaverson, proceeding through separate counsel, have answered plaintiff's complaint and have not moved to dismiss.

Deputy Executive Director of Security.  (Compl. ¶¶ 12, 13)  In
this position, Anemone assumed "full responsibility for all
aspects of security for the MTA's entire infrastructure" and
oversaw a host of initiatives. (Id. ¶ 20)  Among them was the
Joint Infrastructure Task Force ("JITF"), an entity that would
feature a "quick response unit" for all security breaches and an
investigation unit to pursue security lapses on MTA property.
(Id. ¶ 22)  Anemone sought and received approval from MTA
Chairman Kalikow and Executive Director Lapp to house the JITF at
the MTA's leased space at 2 Broadway in Manhattan, a property
that the MTA was then renovating.  (Id. ¶¶ 23, 24)

        In early 2002, while overseeing construction of the
JITF's offices, Anemone discovered that the renovations at 2
Broadway were mired in corruption.  (Id. ¶¶ 30-45)  Although the
renovations were already the subject of a not-yet-public federal
criminal investigation, Anemone commenced his own probe after
learning from a vendor that bill inflation was "common" among MTA
contractors.  (Id. ¶¶ 29, 31-33) Anemone launched his
investigation because "[c]orruption among MTA contractors raised
serious security issues as they are granted access to secure
portions of MTA infrastructure and are privy to confidential
information regarding the operations of the MTA."  (Id. ¶ 34)

        Over the next several months, Anemone and his deputy,
Nicholas Casale, focused on two contractors performing work at 2

Broadway: I-Lite Electric LLC ("I-Lite") and Figliolia Plumbing
("Figliolia").  (Id. ¶¶ 36-45)  Anemone and Casale's
investigation of I-Lite revealed that the company routinely
submitted fraudulent bills and had paid more than $100,000 in
bribes to an MTA official.  (Id. ¶¶ 37-38)  A similar review of
Figliolia's bills and paperwork unearthed "astounding levels of
corruption and fraud" committed with the approval of MTA
officials who received "substantial bribes."  (Id. ¶¶ 41, 42)  In
both cases, Anemone and Casale furnished their findings to the
Manhattan District Attorney's Office; all of the principals
involved later pleaded guilty and paid substantial restitution to
the MTA.  (Id. ¶¶ 39-40, 43-45) Also, as a result of the
investigations, the MTA officials implicated in the frauds were
fired and were the subject of criminal charges. (Id. ¶¶ 39, 44)

     By December 2002, the investigations by Anemone,
Casale, and federal officials had generated mounting criticism of
the MTA and its officials in the press and had compromised the
MTA's position in a multi-million dollar civil suit brought by
Zar Realty, the company that owned and managed 2 Broadway,
alleging mismanagement and breach of contract.  (Id. ¶¶ 46-48)
According to Anemone, defendants' response to increasing public
pressure and a weakening litigation position was to "thwart and
obstruct" his corruption investigations.  (Id. ¶ 49)  First, in
December 2002, Lapp "closed down" Anemone's investigation of John

3

B. Wood, the attorney who negotiated the 2 Broadway lease on behalf of the MTA and managed relations with Zar Realty.  (Id. ¶¶ 50-54)  Next, in February 2003, Lapp terminated Anemone's investigation of improprieties by Long Island Rail Road President Kenneth Bauer relating to Bauer's contacts with Plasser-American Corporation ("Plasser"), an MTA contractor and parts supplier. (Id. ¶¶ 58-59)  Anemone and Casale had been investigating the Bauer-Plasser relationship since the summer of 2002, when Dellaverson, the MTA's Deputy Executive Director/Labor Relations, allegedly had urged them to look into possible unethical conduct by Bauer.  (Id. ¶ 59)  On February 26, 2003, Anemone met with Lapp and informed her of the initial results of his probe, which had uncovered various possible improprieties by Bauer. (Id. ¶¶ 61-62)  Lapp ordered Anemone to cease his investigation and said that she was referring the matter to the MTA's Inspector General Office, headed by defendant Sansverie.  (Id. ¶ 63)

Around the same time, Anemone alleges, the efforts to thwart his investigations "turned hostile."  (Id. ¶ 67)  On February 29, Sansverie requested a "deposition-style" interview with Casale regarding Plasser and other matters, which was held on March 26 and 28.  (Id. ¶ 68-70)  On or about March 27, Sansverie requested a similarly "formal interview" with Anemone. (Id. ¶ 71)  During the March 28 interview, representatives from Sansverie's office asked little about the findings of the Plasser

4

investigation, but questioned Anemone "extensively" about his personal involvement in the investigation and his oversight of Casale.  (Id. ¶¶ 72)  Many of the questions focused on whether Casale truthfully reported the existence of a "confidential informant" who reported on Bauer's dealings with Plasser officials.  (Id. ¶ 73)  Anemone told the questioners that the informant was Dellaverson and that Casale had likely used the term "community source," not "confidential informant."  (Id. ¶ 74) Overall, the interview was "threatening and inquisitorial in tone" and "sent a clear message . . . that future investigations that might prove embarrassing to the MTA would not be tolerated." (Id. ¶ 75)

The day of his interview, Anemone met with reporters from The New York Times. (Id. ¶ 76)  Anemone, who had arranged the meeting, told the reporters that the MTA had "frustrated his staff's efforts to investigate corruption within the MTA and among MTA contractors" by refusing to provide essential records, ordering him to stop his investigations, and subjecting him and Casale to "inquisition-style" interviews.  (Id. ¶ 77) He also stated that security throughout the MTA suffered from a "lack of transparency in the MTA administration."  (Id.) The newspaper published Anemone's comments on March 30 and Anemone's criticisms were repeated in several regional and national newspapers.  (Id. ¶¶ 78, 79)

On March 31, MTA officials allegedly took "immediate and direct retaliation" against Anemone in the form of an "Interim Report" authored by Sansverie and sent to Kalikow recommending Anemone's suspension. (Id. ¶ 80)  The Interim Report allegedly contained "a litany of factual misrepresentations, distortions of statements made by various individuals, and a series of unfounded accusations."  (Id. ¶ 81) Specifically, the report falsely stated that Anemone had: (1) admitted to the Inspector General's office that there had never been a "confidential informant" in the Plasser matter; (2) lied to investigators by "fabricating a confidential informant" in order to accuse Bauer of misconduct; and (3) authorized the Plasser investigation against the direct order of Lapp, his superior. (Id. ¶¶ 81-82)

On April 1, Kalikow suspended Anemone, placing him on paid leave.  (Id. ¶ 85)  In connection with the suspension, the MTA issued a press release containing many of the Interim Report's allegations and released the report to the press.  (Id. ¶¶ 85-86)  Over the next few days, major news outlets, including The New York Times, New York Daily News, New York Newsday, and the Associated Press, ran stories that publicized the Interim Report's allegations of misconduct and featured comments from MTA officials condemning Anemone's actions. (See id. ¶¶ 86-89)

On April 11, after a week of additional public sparring

between Anemone and the MTA, Anemone, testifying before the New
York State Assembly Standing Committee on Corporations,
Authorities, and Commissions, criticized the MTA Inspector
General's office and expressed "concerns about [Sansverie's]
commitment to combating corruption." (Id. ¶¶ 92-95)
Specifically, Anemone highlighted Sansverie's "failure to
discover and prosecute gross corruption and fraud by I-Lite";
Sansverie's assignment of investigators to "inconsequential work
and allow[ing] the frauds [against the MTA] to continue"; and
other lapses. (Id. (brackets in original)) Anemone's critical
statements were reported in regional and national newspapers.
(Id. ¶ 96)

        One week later, Sansverie allegedly retaliated again by
sending Kalikow a letter that Sansverie also leaked to the press
and posted on the MTA's website. (Id. ¶¶ 97, 102) The April 18
letter alleged that Anemone had "grossly misrepresented" the size
and composition of an advisory board Anemone was forming to
consult the JITF in various areas of emergency management;
violated the law by providing these advisory board members with
MTA identification; and acted improperly by awarding a canine
security contract to a company operated by an acquaintance. (Id.
¶¶ 98-100) Sansverie's assertions allegedly were "false and based
on gross distortions of the facts." (Id. ¶ 101)

        On May 8, Dellaverson, who was a "critical participant"

                                  7

in reviewing the allegations against Anemone, told Anemone that the MTA had decided to terminate his employment.  (Id. ¶¶ 103, 110-11) It is not clear from the Complaint what kind of process Anemone was provided prior to his termination.  However, Anemone alleges that in the weeks leading up to his firing, he was not given adequate time to respond to the Interim Report, was provided no chance to respond to Sansverie's April 18 letter, and was not furnished with evidentiary materials in a timely fashion. (See id. ¶¶ 106-08)  He complains also that Dellaverson's involvement in the termination decision was "significant" and "improper" given Dellaverson's "interest in undermining . . . Anemone's credibility."  (Id. ¶¶ 109-10)

On May 9, 2003, Anemone requested a "name clearing hearing" to contest defendants' allegations, which was denied. (Id. ¶ 112-13)

On March 24, 2005, Anemone filed the complaint in the present action.


II.

A district court may grant a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6) only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  In considering a motion to dismiss,

the court must accept all of the complaint's factual allegations
as true and draw all reasonable inferences in the plaintiff's
favor.   Abramson v. Pataki, 278 F.3d 93, 99 (2d Cir. 2002).
Applying these liberal standards, I find for the reasons
explained below that Anemone states a claim against Sansverie in
his individual capacity for free speech retaliation in violation
of his federal and state constitutional rights.   However, he
fails to state a claim against Sansverie for violations of due
process rights secured by either constitution, and cannot bring
any of his claims based on a conspiracy theory.[2]   His due process
and conspiracy claims therefore are dismissed.


A. Free Speech Retaliation Claims

        Because the MTA is a public benefit corporation, see
N.Y. Pub. Auth. Law § 1263(1)(a) (McKinney 1999 & Supp. 2005),
and all individual defendants were MTA employees, Anemone's First
Amendment retaliation claim is properly evaluated under the line

_____

        [2]        In addition, all of Anemone's free speech and due
process claims brought against Sansverie in his "official
capacity" are dismissed. (Compl. ¶ 11)  "[A]n official-capacity
suit is, in all respects other than name, to be treated as a suit
against the entity . . . [and] is not a suit against the official
personally."  Kentucky v. Graham, 473 U.S. 159, 165-66 (1985).
Where, as here, the entity also is named as a defendant, the
official capacity claims are redundant and are properly
dismissed.  See Walton v. Safir, 122 F. Supp. 2d 466, 477 n.12
(S.D.N.Y. 2001); Sheriff's Silver Star Ass'n v. County of Oswego,
56 F. Supp. 2d 263, 265 n.3 (N.D.N.Y. 1999); Nogue v. City of New
York, No. 98 Civ. 3058 (JG), 1999 WL 669231, at *7 n.13 (E.D.N.Y.
Aug. 27, 1999).

of cases developed specifically in the public employment setting.
See, e.g., Munafo v. Metro. Transp. Auth., 285 F.3d 201, 211-12
(2d Cir. 2002).  This setting, which these parties overlook at
times, is important because "when playing the role of employer,
the state possesses 'greater leeway to control employees' speech
that threatens to undermine its ability to perform its legitimate
functions.'"  Cobb v. Pozzi, 363 F.3d 89, 101 (2d Cir. 2004)
(quoting Lewis v. Cohen, 165 F.3d 154, 161 (2d Cir. 1999)); see
also Waters v. Churchill, 511 U.S. 661, 671 (1994) (plurality
opinion) (noting that "the government as employer . . . has far
broader powers than does the government as sovereign").  Despite
this "greater leeway," the government's power to restrict speech
is not absolute.  "[A] public employee does not relinquish First
Amendment rights to comment on matters of public interest by
virtue of government employment."  Connick v. Myers, 461 U.S.
138, 140 (1983).

To state a First Amendment retaliation claim as a
public employee, a plaintiff must allege that (1) his speech
addressed a matter of public concern; (2) he suffered an adverse
employment action; and (3) a causal connection existed between
the speech and the adverse employment action "so that it can be
said that his speech was a motivating factor in the
determination."  Mandell v. County of Suffolk, 316 F.3d 368, 382
(2d Cir. 2003) (quoting Morris v. Lindau, 196 F.3d 102, 110 (2d

Cir. 1999)).  If a plaintiff has alleged these three elements, the public employer may still avoid liability if it shows that the plaintiff's speech was likely to disrupt the government's activities to an extent that outweighs First Amendment value of the speech.  Mandell, 316 F.3d at 382-83; see also Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968) (explaining that court must balance the interests of the employee "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees"); Cobb, 363 F.3d at 102.  Alternatively, the public employer is not liable if it demonstrates that it would have taken the same adverse action even absent the protected speech.  Mandell, 316 F.3d at 382-83; Cobb, 363 F.3d at 102.  With these principles in mind, I turn to Anemone's allegations.

1. Relationship of Anemone's Speech to Matter of Public Concern

        "As a general rule, speech on 'any matter of political, social, or other concern to the community' is protected by the First Amendment."  Morris, 196 F.3d at 110 (quoting Connick, 461 U.S. at 146).  Speech relating to public corruption and/or a public entity's failure to adequately or properly investigate such corruption lies comfortably within these categories of protected expression.  See, e.g., Vasbinder v. Ambach, 926 F.2d

11

1333, 1340, 1341 (2d Cir. 1991) (holding that employee's contact
with FBI regarding defendant's "potential fraud, theft, and
misallocation of public funds" was a matter of public concern);
Rookard v. Health & Hosps. Corp., 710 F.2d 41, 46 (2d Cir. 1983)
(holding that employee's allegation of "corrupt and wasteful
practices" at municipal hospital "obviously" involved matter of
public concern).  Because all the speech for which Anemone
alleges retaliation relates to MTA corruption and the agency's
(and Sansverie's) allegedly inadequate efforts to investigate
such corruption (see, e.g., Compl. ¶¶ 61-62, 77, 95-96), it meets
the "public concern" test and is constitutionally protected.


2. Adverse Employment Action

          Whether Anemone has pleaded an adverse employment
action against Sansverie is a closer question.  "Adverse
employment actions include discharge, refusal to hire, refusal to
promote, demotion, reduction in pay, and reprimand."   Morris,
196 F.3d at 110.  However, this list is not exclusive and "lesser
actions may meet the adversity threshold" in the appropriate case
where "seemingly minor incidents . . . reach a critical mass."
Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002).  These
lesser actions suffice if the plaintiff shows that "(1) using an
objective standard; (2) the total circumstances of [his] working
environment changed to become unreasonably inferior and adverse

when compared to a typical or normal, not ideal or model, workplace." Id.

In evaluating an adverse employment action at the motion to dismiss stage, the Second Circuit has recognized that "it would be burdensome to have the district court 'prune' a complaint . . . by making a determination with regard to each allegation within a cause of action that is legally cognizable when viewed in its totality.  This balancing process and assessment and elimination of non-constitutional claims is more appropriately undertaken by the district court at a later stage of the proceedings, namely upon review of motions pursuant to Rule 56 or Rule 50." Bernheim v. Litt, 79 F.3d 318, 326 (2d Cir. 1996).  Applying this principle, the Court held that an elementary school teacher had adequately alleged an adverse employment action for purposes of Fed. R. Civ. P. 12(b)(6) where she pointed to a host of purportedly adverse actions, ranging from a reduction in her classroom preparation periods to wrongful accusations of absenteeism.  See id. at 323-25.  The Court declined to dismiss the lesser adverse actions, finding that "the integrity of the complaint of a whole . . . should be preserved at this early phase of the action." Id. at 326.

Like the plaintiff in Burnheim, Anemone relies on several acts by Sansverie to demonstrate an adverse employment action. (See Pl. Mem. at 19-27)  Specifically, Anemone points to:

13

(1) the March 28 "formal interview" conducted by Sansverie's office regarding Anemone's involvement in the Plasser matter that was "threatening and inquisitorial in tone" (Compl. ¶¶ 71-72, 75); (2) the March 31 Interim Report sent by Sansverie to Kalikow recommending Anemone's suspension, which contained "a litany of factual misrepresentations, distortions of statements . . . and a series of unfounded accusations" (id. ¶¶ 80-81); and (3) the April 18 letter sent by Sansverie to Kalikow that Sansverie allegedly leaked to the press and posted on the MTA's website containing "false" allegations "based on gross distortions of facts" regarding Anemone's creation of the JITF advisory board and award of a canine security contract (id. ¶¶ 97-101).[3]

Such investigations and threats of disciplinary action are generally not, standing alone, sufficient to plead an adverse employment action. See Boylan v. Arruda, 42 F. Supp. 2d 352,

---

[3]      Anemone cannot rely on his suspension and termination as adverse employment actions because he does not allege that Sansverie was personally involved in the decision to suspend or fire him, aside from authoring the Interim Report and the April 18 letter. See Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 254 (2d Cir. 2001) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (quoting Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)).  However, Sansverie may be held liable for the "threatening and inquisitorial" interview conducted by his subordinates because he ordered the interview and it can be inferred at the motion to dismiss stage that he was responsible for its tone.  (Compl. ¶¶ 71-72, 75); see Johnson, 239 F.3d at 254-55 (setting out factors to assess liability of supervisory official for constitutional deprivation).

356-58 (S.D.N.Y. 1999); Kane v. Krebser, 44 F. Supp. 2d 542, 546-
47 (S.D.N.Y. 1999); Wallace v. Suffolk County Police Dep't, 396
F. Supp. 2d 251, 261 (E.D.N.Y. 2005); Radolf v. Univ. of Conn.,
364 F. Supp. 2d 204, 224 (D. Conn. 2005).  However, when courts
have found such acts insufficient, they have relied heavily on
the fact that the investigations or charges at issue did not
result in subsequent employment consequences.  See Boylan, 42 F.
Supp. 2d at 358 (noting that plaintiff "suffered no employment
consequences" as a result of allegedly unfounded investigation
other than possible reputational injury); Kane, 44 F. Supp. 2d at
546-47 (noting that reprimand letter was expunged from employee's
file the following day); Wallace, 396 F. Supp. 2d at 261
(emphasizing that plaintiff failed to "allege either that the
charges were decided against Plaintiff, or that Plaintiff
suffered any changes in the circumstances of his employment
status"); Radolf, 364 F. Supp. 2d at 224 (emphasizing that
plaintiff was exonerated by investigation and that accusations
did not result in any discipline or "any reduction in his pay,
benefits, or terms of his employment").  By contrast, an adverse
employment action may be found where the plaintiff can point to
some tangible adverse consequence resulting from the charges or
investigation.  See Washington v. County of Rockland, 373 F.3d
310, 320 (2d Cir. 2004) (filing of disciplinary charges could
constitute adverse employment action where charges were

accompanied by defendants' 30-day suspension without pay);
Ayiloge v. City of New York, No. 00 Civ. 5051 (THK), 2002 WL
1424589, at *12 (S.D.N.Y. June 28, 2002) (filing of disciplinary
charges constituted adverse employment action where charges
resulted in "one adverse finding" against plaintiff that would
remain in his employment file).

        Here, Anemone alleges that (1) Sansverie orchestrated a
retaliatory investigation that included hostile interviews, a
defamatory Interim Report and letter, and the recommendation of
disciplinary action and (2) Sansverie's investigation led to his
suspension and firing.  (See Compl. ¶¶ 81, 97, 101-02) These
adverse consequences distinguish Anemone's allegations from the
allegations in Boylan, Kane, Radolf, and Wallace, and suggest
that Sansverie's actions, if proved, are sufficient to ground a
First Amendment retaliation claim.  Although dismissal may be
warranted at a later stage of the proceedings if Anemone cannot
substantiate his allegations, they suffice to defeat defendant's
motion to dismiss.


3. Causal Connection Between Anemone's Speech and Adverse
Employment Action

        Last, Anemone has pleaded a causal connection between
his protected speech and Sansverie's adverse employment actions.
Such a causal connection may be demonstrated by circumstantial
evidence, "for example, by showing that the protected activity

was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." Morris, 196 F.3d at 110; see also Mandell, 316 F.3d at 383.  Either way, the causal connection "must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action." Morris, 196 F.3d at 110.

Anemone has pleaded a causal connection for each of Sansverie's adverse actions.  First, he alleges that Sansverie's hostile investigation followed less than a month after he met with Lapp to share the early results of the Plasser investigation -- results that could have further embarrassed Sansverie and the MTA.  (Compl. ¶¶ 61-63, 71-72).  Second, he alleges that Sansverie's Interim Report was filed just a day after The New York Times published Anemone's comments questioning the MTA's commitment to investigating and prosecuting corruption. (Id. ¶¶ 77, 80-81)  Third, he alleges that Sansverie sent the April 18 letter to Kalikow one week after Anemone questioned Sansverie's commitment to prosecuting corruption in testimony before the assembly committee.  (Id. ¶¶ 95-97)  These allegations "warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action," Morris, 196 F.3d at 110, and suggest that Anemone may be able to establish a causal connection through either circumstantial or direct evidence.

17

Therefore, Anemone has pleaded all three elements of a First Amendment retaliation claim under 42 U.S.C. § 1983. Sansverie may yet defeat plaintiff's claim by demonstrating that the MTA's interests in efficiency outweigh Anemone's First Amendment rights or that he would have taken the same actions even absent Anemone's protected speech, see Mandell, 316 F.3d at 382-83.  However, consideration of these defenses is premature on defendant's motion to dismiss.[4]

Anemone has stated also a free speech retaliation claim under Article I, § 8 of the New York Constitution.  Neither party suggests that the treatment of Anemone's free speech claim is any different under the state constitution (see, e.g., Def. Mem. at 11 n.3), and courts have concluded that the same analysis applies to such claims, see, e.g., Haniq v. Yorktown Cent. Sch. Dist., 384 F. Supp. 2d 710, 722 n.10 (S.D.N.Y. 2005).

B. Procedural Due Process Claims

Anemone next claims procedural due process violations in connection with his termination and alleged reputational

---

[4]     It is also too early to assess whether Anemone's potential status as a "policymaker" insulates Sansverie from liability.  (See Def. Reply Mem. at 11-12)  Anemone's status as a policymaker, if proved, would not be a complete defense to liability, but would "weigh, normally heavily, on the employer's side in the Pickering balance."  McEvoy v. Spencer, 124 F.3d 92, 103 (2d Cir. 1997).  If and when such Pickering balancing is conducted, the court will assess whether Anemone is a policymaker and the impact of such status on defendant's liability.

injuries.  (See Compl. ¶¶ 129-36, 137-44, 145-55, 156-66)  "In
order to succeed on a claim of deprivation of procedural due
process, a plaintiff must establish that state action deprived
him of a protected property or liberty interest."  White Plains
Towing Corp. v. Patterson, 991 F.2d 1049, 1062 (2d Cir. 1993).
Although Anemone seeks to fashion a procedural due process claim
based on deprivation of both property and liberty interests, his
allegations fail to state a claim for either.

1. Property Interest

        To plead an unconstitutional deprivation of property,
Anemone must identify a constitutionally protected property
interest that was deprived.  The federal constitution does not
create such property interests -- "[r]ather they are created . .
. by existing rules or understandings that stem from an
independent source such as state law."  Bd. of Regents of State
Colleges v. Roth, 408 U.S. 564, 577 (1972).  If a plaintiff fails
to identify such an interest, his procedural due process claims
must be dismissed because "[t]he requirements of procedural due
process apply only to the deprivations of interests encompassed
by the Fourteenth Amendment's protection of liberty and
property."  Id. at 569.

        Anemone bases his procedural due process claims on the
loss of his employment with the MTA and damage to his

professional reputation.  (See Compl. ¶¶ 130, 138)  But neither of these interests constitutes protected property.  Plaintiff concedes that he was an "at will" employee and, as such, has no constitutionally protected interest in his employment.  (See Pl. Mem. at 31); see also Roth, 408 U.S. at 576-78; Abramson, 278 F.3d at 99; Natalizio v. City of Middletown, 301 A.D.2d 507, 507-08, 754 N.Y.S.2d 24, 25 (2d Dep't 2003).  As for Anemone's alleged reputational injury, the law is clear that a plaintiff's reputational interest is not constitutionally protected property and that remedies for reputational harms lie in state defamation law.  See Paul v. Davis, 424 U.S. 693, 711-12 (1976); Patterson v. City of Utica, 370 F.3d 322, 329-30 (2d Cir. 2004).  Because Anemone fails to identify a property interest that is constitutionally protected, his federal and state procedural due process claims based on property deprivations are dismissed.

2. Liberty Interest

        Anemone's due process claims against Sansverie based on deprivation of a protected liberty interest also fail.  Although reputational injuries alone do not implicate a constitutionally protected liberty interest, "[l]oss of one's reputation can . . . invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest, such as government employment."  Patterson, 370 F.3d at 330.  If such an

interest is implicated, due process usually requires that the plaintiff be provided some form of hearing prior to the liberty deprivation, although a post-deprivation hearing comports with due process in limited circumstances.  See DiBlasio v. Novello, 344 F.3d 292, 302 (2d Cir. 2003).  To plead the deprivation of a protected liberty interest, a plaintiff must allege a "stigma plus" injury -- i.e., the utterance of a "statement sufficiently derogatory to injure his reputation" that is capable of being proved false and a material, state-imposed burden or state-imposed alteration of the plaintiff's status or rights.  Sadallah v. City of Utica, 383 F.3d 34, 38 (2d Cir. 2004).  To constitute a "stigma," the defamatory statements must "call into question plaintiff's 'good name, reputation, honor, or integrity.'" Patterson, 370 F.3d at 330 (quoting Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 446 (2d Cir. 1980)).  The "plus," meanwhile, must be in addition to the stigmatizing statements, and "'deleterious effects [flowing] directly from a sullied reputation,' standing alone, do not constitute a 'plus.'" Sadallah, 383 F.3d at 38 (quoting Valmonte v. Bane, 18 F.3d 992, 1001 (2d Cir. 1994)) (brackets in original); see also Cassidy v. Scoppetta, 365 F. Supp. 2d 283, 289 n.10 (E.D.N.Y. 2005) ("[T]he 'stigma' and the 'plus' must be two distinct things.").

Although the "stigma" and the "plus" typically will originate with the same state actor, "perfect parity in the

origin of both the 'stigma' and the 'plus' is not required" as long as the "stigma" and "plus" are "sufficiently proximate." Velez v. Levy, 401 F.3d 75, 89 (2d Cir. 2005).  This proximity is present where "(1) the stigma and plus would, to a reasonable observer, appear connected -- for example, due to their order of occurrence, or their origin -- and (2) the actor imposing the plus adopted (explicitly or implicitly) those statements in doing so."  Id. (internal citations omitted).  Applying this test, the Velez Court found a "stigma plus" injury adequately pleaded where a school board member was fired after other board members aired false accusations against her (the "stigma") and the schools' chancellor adopted the board's recommendation and fired her (the "plus").  See id. at 88, 90.

Where the "stigma" and the "plus" originate with different actors, it is possible that "for any number of reasons . . . one or more defendants whose actions collectively implicate a liberty interest may not be liable for the deprivation of that liberty interest."  Velez, 401 F.3d at 89 n.12.  One such case is where a particular defendant lacks the power to provide process to the plaintiff in connection with the liberty deprivation.  See id. at 93.  Applying this principle, the Velez Court dismissed the plaintiff's claims against her board member colleagues because "none of [them] had the power to provide process," as they could neither oversee the investigation

prompted by their stigmatizing statements nor "order . . . pre-removal review []or post-removal remedies." <u>Id.</u> at 93. Similarly, the investigators who conducted the inquiry into the board's accusations and issued a report relied on by the chancellor could not be liable because they "had no legal authority to bring about her ouster, for only [the chancellor] was empowered to impose that 'plus.'" <u>Id.</u>  Only the chancellor, who adopted the board's recommendation and fired the plaintiff without first providing the pre-deprivation hearing required by due process, could be held liable.  <u>See id.</u> at 92.

Here, Anemone adequately alleges the "stigma plus" injury needed to ground a liberty deprivation claim.  Both Sansverie's March 31 Interim Report, which the MTA released to the press and summarized in a news release, and the April 18 Sansverie letter, which Sansverie allegedly leaked to the press and posted on the MTA's website, constitute a "stigma," as each publicly called into question Anemone's "good name, reputation, honor, or integrity" and could presumably be proved false. <u>Patterson</u>, 370 F.3d at 330 (internal quotation marks omitted); <u>Sadallah</u>, 383 F.3d at 38.  Anemone's firing by the MTA is unquestionably a "plus" –- a "tangible and material state-imposed burden." <u>Sadallah</u>, 383 F.3d at 38.[5]  Although inflicted by

---

[5]  The "plus" was not, as Anemone seems to suggest at times in his submissions (<u>see</u> Compl. ¶¶ 152, 153; Pl. Mem. at 31-35), the subsequent damage to his reputation inflicted by Sansverie's

different actors, the "stigma" and the "plus" constitute a
liberty interest deprivation because the MTA's act of termination
implicitly adopted Sansverie's stigmatizing allegations and would
appear, to anyone who had read of the allegations, to be
connected to them.  Velez, 401 F.3d at 89.

However, as Velez observed, "[t]he existence of a
liberty interest, based upon stigma-plus (in cases in which the
stigma and the plus have different origins) is a very different
question from that of whether both the originator of the stigma
and the imposer of the plus are liable to the plaintiff."  Velez,
401 F.3d at 89 n.12 (emphasis omitted and added).  Here, although
Sansverie was the source of the stigmatizing statements, he is
not alleged to have imposed the "plus" of termination, nor is he
alleged to have had any role in shaping or authority to shape the
process Anemone was provided before he was fired.  That is
consistent with the Public Authorities Law, which limits
Sansverie to investigating abuse and recommending remedial action
and does not contemplate any role for him in adjudicating an
employee's employment status with the MTA.  See generally N.Y.
Pub. Auth. Law § 1279.  Like the board members and investigators
in Velez, Sansverie "could order neither [the] pre-removal review
nor post-removal remedies" that due process required and "had no

---

stigmatizing statements.  Such a "plus" would be insufficient as
a matter of law. See Sadallah, 383 F.3d at 38.

legal authority to bring about [Anemone's] ouster." <u>Velez</u>, 401 F.3d at 93.

Anemone proposes various actions Sansverie could have taken to "blunt the impact of his public attack," such as conducting further research, publishing a corrected report, or allowing for further submissions (<u>see</u> Pl. Mem. at 35).  However, these "remedies" all relate to the "stigma" and none of them constitute the pre- or post-termination process that would have prevented the alleged deprivation of plaintiff's constitutional rights.[6]  In <u>Velez</u>, the Court rejected the notion that either the board members, who imposed the "stigma," or the investigators, who had written the report that provided the basis for the "plus," could provide the necessary process, even though each presumably could have afforded Velez the types of stigma-related relief that Anemone demands here.  Rather, only the chancellor could be liable because only he could fire Velez and provide her the pre-termination hearing that due process required. <u>Id.</u> at 93.  Similarly, only Dellaverson and other MTA officials could fire Anemone and furnish whatever process was due in connection with his termination.

Anemone's liberty interest claim under the Fourteenth

---

[6]     Because Sansverie had no power to provide process, the court does not consider whether the process provided to Anemone was constitutionally adequate nor does it determine whether a pre-termination hearing was constitutionally required.  <u>See</u> <u>DiBlasio</u>, 344 F.3d at 302.

Amendment against Sansverie therefore is dismissed.  Because the parties do not suggest that the analysis is any different under the New York State Constitution and the court cannot discern any reason why such an analysis would compel a different result, Anemone's procedural due process liberty claim against Sansverie brought under Article I, § 6 of the New York Constitution is dismissed as well.

C. Conspiracy

Anemone's free speech retaliation and due process claims against Sansverie based on a conspiracy theory also fail. (See Compl. ¶¶ 118, 126, 132, 140, 148, 160)  In general, a conspiracy claim under 42 U.S.C. § 1983 requires an agreement between a state actor and a private party or other state actor to act in concert to inflict an unconstitutional injury and an overt act done in furtherance of that goal causing damages. Ciambriello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002).  However, under the intracorporate conspiracy doctrine, "[w]here individual defendants are all employees of the institutional defendant, a claim of conspiracy will not stand." Nat'l Congress for Puerto Rican Rights v. City of New York, 75 F. Supp. 2d 154, 168-69 (S.D.N.Y. 1999) (internal quotation marks omitted); see also id. at 169 (dismissing conspiracy against NYPD officers and police commissioner because they belonged to the

same entity); <u>Nassau County Employee "L"</u> v. <u>County of Nassau</u>, 345 F. Supp. 2d 293, 304-05 (E.D.N.Y. 2004); <u>Everson</u> v. <u>New York City Transit Auth.</u>, 216 F. Supp. 2d 71, 75-76 (E.D.N.Y. 2002); <u>Everston</u> v. <u>State of New York Mortgage Agency</u>, No. 89 Civ. 7474 (RJW), 1992 WL 6190, at *6 (S.D.N.Y. Jan. 3, 1992).

Here, Anemone's alleged co-conspirators -- Kalikow, Lapp, and Dellaverson -- are employees of the MTA, the institutional defendant in this action.  (<u>See</u> Compl. ¶¶ 8-10) Sansverie, as MTA Inspector General, is also an MTA employee, as the Public Authorities Law creates the Inspector General's office "<u>in</u> the metropolitan transportation authority,"  N.Y. Pub. Auth. Law § 1279(1) (emphasis added), and the law's legislative history similarly notes that the office is created "<u>within</u>" the MTA to "investigat[e] allegations of fraud and abuse."  <u>See</u> Governor's Mem., 1983 N.Y. Sess. Laws 2771 (McKinney) (emphasis added); <u>see also</u> <u>Best-Simpson</u> v. <u>New York City Transit Auth.</u>, 221 A.D.2d 398, 398, 633 N.Y.S.2d 535, 536 (2d Dep't 1995) (rejecting argument that Inspector General's office is a "separate and distinct entity" from the MTA under the Public Authorities Law).  Because Sansverie and all of his co-defendants are MTA employees, plaintiff cannot state free speech and due process conspiracy claims under § 1983.

III.

Anticipating that the court might find that Anemone has properly stated one or more constitutional claims, Sansverie argues that plaintiff's complaint must still be dismissed because the MTA Inspector General is protected by either absolute or qualified immunity.  (See Def. Mem. at 15-19)  As explained below, I disagree.

A. Absolute Immunity

To invoke absolute immunity, Sansverie must demonstrate that the MTA Inspector General "perform[s] 'special functions' which, because of their similarity to functions that would have been immune when Congress enacted § 1983, deserve absolute protection from damages liability."  Buckley v. Fitzsimmons, 509 U.S. 259, 268-69 (1993) (quoting Butz v. Economou, 438 U.S. 478, 508 (1978)).  "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties."  Burns v. Reed, 500 U.S. 478, 486-87 (1991).  However, judges, prosecutors, and other officials who perform analogous judicial or prosecutorial functions have been granted absolute protection.  See Butz, 438 U.S. at 508-11.  "For executive officials in general, however . . . qualified immunity represents the norm."  Harlow v. Fitzgerald, 457 U.S.

28

800, 807 (1982); see also Butz, 438 U.S. at 506-08.[7]

To determine whether a public official acts like a judge or prosecutor, courts use a "functional approach" that looks to the "nature of the responsibilities of the individual official" rather than relying solely on his "rank or title or 'location within the Government.'" Cleavinger v. Saxner, 474 U.S. 193, 201 (1985) (quoting Butz, 438 U.S. at 511). Applying such a "functional approach" to the MTA Inspector General, Sansverie does not resemble either a judge or a prosecutor. Under the Public Authorities Law, the MTA Inspector General is charged with "receiv[ing] and investigating complaints from any source or upon his own initiative concerning alleged abuses . . . [and] frauds"; "initiat[ing] such reviews as he may deem appropriate of the operations of the [MTA] and its subsidiaries"; "recommend[ing] remedial actions to be taken by the [MTA] and its subsidiaries"; and making available to law enforcement any

———————————

[7]     Sansverie's reliance on Firth v. State, 12 A.D.3d 907, 785 N.Y.S.2d 755 (3d Dep't 2004), which extended absolute immunity to the state inspector general for state law defamation claims, is misplaced. The doctrine of federal absolute immunity, which is derived from Congress's original intent when it enacted § 1983, see Burns, 500 U.S. at 493-94, does not bestow such immunity for constitutional claims on executive officials with administrative or executive policymaking responsibilities or their subordinates. See Firth, 12 A.D.3d at 907-08, 786 N.Y.S.2d at 756-57; cf. Butz, 438 U.S. at 505 ("The extension of absolute immunity from damages to all federal executive officials would seriously erode the protection provided by basic constitutional guarantees."). Indeed, even the Attorney General is entitled to only qualified immunity when engaged in non-protected functions. See Mitchell v. Forsyth, 472 U.S. 511 (1985).

evidence of criminal wrongdoing.  N.Y. Pub. Auth. Law §§
1279(4)(a)-(d).  In carrying out these duties, the statute gives
the MTA Inspector General the power to subpoena witnesses,
administer oaths, take testimony, and compel the production of
documents, and to "monitor" the implementation of his
recommendations.  See id. §§ 1279(4)(e)- (f).  These
responsibilities, which do not include authority to conduct
proceedings, hear evidence, or impose discipline, are not
adjudicative.  Nor can they be characterized as prosecutorial, as
the MTA Inspector General can only investigate abuse and has no
authority actually to bring charges and initiate a criminal
prosecution.  See DiBlasio, 344 F.3d at 301 (defendant not
entitled to prosecutorial immunity because "as an investigator,
[he] lacked the authority to initiate charges"); Scotto v.
Almenas, 143 F.3d 105, 112-13 (2d Cir. 1998) (defendant not
entitled to prosecutorial immunity because he lacked authority to
initiate parole revocation proceedings).  Investigatory acts
before the initiation of a criminal prosecution, even when
performed by prosecutors themselves, are not entitled to absolute
immunity.  See Buckley, 509 U.S. at 272-76; Hill v. City of New
York, 45 F.3d 653, 661 (2d Cir. 1995); Scotto, 143 F.3d at 112-
13.  Thus, the MTA Inspector General does not serve a
prosecutorial function.

        Finally, this court cannot expand the scope of absolute

immunity on the ground that the "effectiveness of [Sansverie's]
role will be marginalized" (Def. Mem. at 19) because the court
simply "'do[es] not have a license to establish immunities from §
1983 actions in the interests of what [the court] judge[s] to be
sound public policy.'"  Burns, 500 U.S. at 493 (quoting Tower v.
Glover, 467 U.S. 914, 922-23 (1984)).  Sansverie's invocation of
absolute immunity therefore is rejected.


B. Qualified Immunity

        Under the doctrine of qualified immunity, government
officials performing discretionary functions are shielded from
liability if "their conduct does not violate clearly established
statutory or constitutional rights of which a reasonable person
would have known."  Harlow, 457 U.S. at 818.  Where, as here, the
court has already determined that a plaintiff has properly
alleged constitutionally prohibited conduct, the defendant
official is entitled to immunity if either (1) the plaintiff's
right not to be subjected to such conduct was not "clearly
established" at the time of the conduct or (2) the defendant's
challenged action was objectively reasonable in light of the
legal rules that were clearly established at the time it was
taken.  See Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d
246, 250 (2d Cir. 2001); X-Men Sec., Inc. v. Pataki, 196 F.3d 56,
66 (2d Cir. 1999).  A court may make such a finding on a motion

31

to dismiss, but "the defense faces a formidable hurdle when advanced on such a motion." McKenna v. Wright, 386 F.3d 432, 434 (2d Cir. 2004) (internal quotation marks omitted).  Specifically, when a court considers the defense, "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense."  Id. at 436.

A constitutional right is "clearly established" when (1) the law was defined with reasonable clarity; (2) the Supreme Court or the Second Circuit has recognized the right; and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful.  Anderson v. Recore, 317 F.3d 194, 197 (2d Cir. 2003); Powell v. Schriver, 175 F.3d 107, 113 (2d Cir. 1999); Velez, 401 F.3d at 100.  Prior case law need not present fundamentally similar facts and "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  Hope v. Pelzer, 536 U.S. 730, 740-41 (2002).

Anemone's right to be free from retaliation based on protected speech was defined with sufficient clarity to have been "clearly established" at the time of Sansverie's Interim Report and letter in 2003.  By that time, a public employee's right to speak on matters of public concern without facing improper government retaliation was settled, see Pickering, 391 U.S. at

568, and the three-factor test for evaluating an employee's claim had long been in use in the Second Circuit, see, e.g., Morris, 196 F.3d at 110.   In addition, the Second Circuit had explained that although "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand" were "classic" examples of adverse employment actions, "lesser actions [could] meet the adversity threshold," Phillips, 278 F.3d at 109. Indeed, in Burnheim, the Court concluded that a host of alleged retaliatory acts with varying degrees of severity could, taken together, comprise an adverse employment action at the motion to dismiss stage, see Burnheim, 79 F.3d at 324, 326.   Although neither the Second Circuit nor the Supreme Court had considered the precise factual scenario alleged in Anemone's complaint, such prior consideration is not required.   Hope, 536 U.S. at 740-41.

Sansverie is also not entitled to qualified immunity on the ground his conduct was "objectively reasonable."   See X-Men, 196 F.3d at 66.   There is as of yet no record to establish whether Sansverie acted reasonably, and this court cannot say that defendant has cleared the "formidable hurdles" he confronts when invoking qualified immunity on a motion to dismiss. McKenna, 386 F.3d at 434, 436.   Although Sansverie may be able to demonstrate reasonableness at a later stage in the proceedings, he has not yet presented the facts needed to do so.   Sansverie's motion based on qualified immunity therefore is denied.

33

*        *        *

For the reasons set forth above, Sansverie's motion to dismiss the "individual capacity" claims against him is granted with respect to Anemone's procedural due process claims under the United States and New York Constitutions, but denied with respect to plaintiff's free speech retaliation claims brought under both constitutions.  All of Anemone's "official capacity" and conspiracy claims against Sansverie are dismissed as well.

The parties will attend a conference on February 14, 2006 at 9:15 a.m. to discuss the future schedule in this litigation.

SO ORDERED:

Dated:   New York, New York                Michael B. Mukasey,
         January 24, 2006                   U.S. District Judge

34