UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------X
                              :

LOUIS R. ANEMONE,            :      05 Civ. 3170 (LAP)
                              :

              Plaintiff,     :

                              :      OPINION
       v.                  :

                              :
METROPOLITAN TRANSPORTATION    :
AUTHORITY, PETER S. KALIKOW,     :
KATHERINE N. LAPP, GARY J.      :
DELLAVERSON and MATTHEW D.      :
SANSVERIE,                  :

                              :
              Defendants.     :
                              :
----------------------------------x

LORETTA A. PRESKA, U.S.D.J.

      Plaintiff Louis R. Anemone brings this action against

the Metropolitan Transit Authority ("MTA") and individual

Defendants Peter S. Kalikow, Katherine N. Lapp, Gary J.

Dellaverson, and Matthew D. Sansverie in their individual

and official capacities for violations of his rights under

the U.S. and New York State Constitutions.[1] All Defendants

move for summary judgment pursuant to Fed. R. Civ. P.

56(c). For the reasons set forth below, Defendants' motions

are GRANTED.

---

[1] Plaintiff has withdrawn his claim pursuant to New York
Civil Service Law § 75-b. See Plaintiff's Memorandum of Law
in Opposition to First Motion for Summary Judgment ("Pl.'s
Mem."), filed on November 2, 2007.

Anemone is Hired by the MTA as its First Director of
Security and Deputy Director of the MTA

Louis Anemone served as the Chief of Department, the
highest ranking uniformed position in the New York City
Police Department from 1995 until his retirement in 1999,
having worked in the department for thirty-five years.
Shortly after the attacks of September 11, 2001, Governor
George Pataki hired Anemone to be the Deputy Director of
the Governor's Office of Public Security, and on December
8, 2001, the MTA hired Anemone, on an at-will basis, to be
its first Director of Security and Deputy Executive
Director of the MTA.[3] The MTA vested Anemone's position with
responsibility for all aspects of security throughout the
operating systems of the MTA and its agencies and for
assuring a safe and secure transportation system for the
riding public. (Compl. ¶¶ 12, 18-20.) Anemone's day-to-day
responsibilities included: (i) supervising the operations

---

[2] The facts recited are either undisputed or construed in
the light most favorable to Plaintiff, as the nonmoving
party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
254-55 (1986). Unless otherwise indicated, these facts are
taken from "Plaintiffs' [sic] Rule 56.1(b) Statement of
Material Facts" ("Pl.'s 56.1"), dated October 19, 2007.

[3] The at-will nature of the position was stated in a letter,
signed by Plaintiff, memorializing the terms of his
employment. See Declaration of Neil Abramson, filed on
March 30, 2007 ("Abramson Decl."), Ex. 7.

of the MTA police, (ii) coordinating with the National Guard and the MTA personnel at bridges and tunnels in the metropolitan area, (iii) coordinating the security provided by the NYPD's transportation bureau, (iv) overseeing the security departments of Metro North, the Long Island Railroad, and New York City Transit, and (v) overseeing and directing the security projects acceptable to the Federal Emergency Management Agency. (<u>See</u> MTA Defs.' 56.1 ¶ 11; Compl. ¶ 20.)[4] Given the nature of his position, Anemone was expected to cooperate with and maintain working relationships with outside investigatory agencies, including the MTA's Office of Inspector General ("MTA OIG" or "OIG") and the Manhattan and Queens District Attorneys' Offices. (<u>See</u> MTA Defs.' 56.1 ¶ 13.)

The extent to which Plaintiff's responsibilities included interacting with the press is somewhat hazy based on the summary judgment record. The MTA Defendants state simply that "Anemone interacted with the media as part of his regular duties." (MTA Defs.' 56.1 ¶ 15.) In response to questioning at his deposition, however, Plaintiff indicated

---

[4] "MTA Defs.' 56.1" refers to MTA Defendants' Rule 56.1 Statement, filed on March 30, 2007. Defendants MTA, Kalikow, Lapp, and Dellaverson (collectively "MTA Defs.") are proceeding through separate counsel from defendant Sansverie.

that he (i) did not recall being the "designated
spokesperson" for the MTA on security-related issues, (ii)
would interact with the press only occasionally and only
after direction from his superiors, and (iii) did not
recall ever issuing press releases or holding any press
conferences. (Anemone Tr. 16-18.)[5]

## The JITF and the Geller Alarms / I-Lite Investigation

Early in his tenure as Deputy Executive Director of
Security, Anemone began investigating "inflated and
unreasonable bills" from various contractors working on MTA
projects.[6] Anemone conducted these investigations in part
through the newly created entity called the "Joint
Infrastructure Task Force" ("JITF"). According to an
internal MTA document entitled "State of Command – 2002,"
the JITF was created "to spearhead the [MTA's] counter
terrorism [sic] efforts in the aftermath of the September
11th attack on New York City." (Abramson Decl., Ex. 10.)
The JITF purports to be the "guardian of the Authority's
counter terrorism plan" and lists as its first "mission" to

---

[5] "Anemone Tr." refers to Plaintiff's deposition which is
annexed in its entirety to Abramson Decl. as Exhibit 4.

[6] It is not clear from the record how these investigations
were related to Anemone's role as Deputy Executive Director
of Security. Anemone describes them simply as "security
bolstering investigative efforts." (Pl.'s 56.1 ¶ 9.)

"[d]eter and counter the Authority's vulnerability to terrorism and weapons of mass destruction." (Id.)

Nicholas Casale, Anemone's "deputy," created the JITF and oversaw its activities. (Sansverie 56.1 ¶ 36.)[7] One of JITF's earliest investigations was into two MTA contractors, Geller Alarms and I-Lite Electric. After a hunch by Casale that there was a corrupt relationship between one Ronald Allan, an MTA employee, and these two companies, Casale and Anemone conferred with Gary Dellaverson, the Director of Labor Relations and one of the MTA's Deputy Executive Directors, and commenced an investigation into potential fraud. Though Dellaverson approved of the investigation at the beginning, he soon "had the feeling . . . of [the investigation] being a little bit like a treasure hunt and [Anemone and Casale] weren't hunting for the treasure that I was hunting for." (Dellaverson Tr. at 173.)[8] Nevertheless, Dellaverson testified that Anemone and Casale "subsequently convinced me and I concurred in them [sic] starting a much larger

_____

[7] "Sansverie 56.1" refers to Defendant Matthew D. Sansverie's Statement of Undisputed Material Facts, dated March 30, 2007.

[8] "Dellaverson Tr." refers to the deposition of Gary J. Dellaverson, which is annexed to the Brinckerhoff Decl. as Exhibit 1, as well to as the Abramson Decl. as Exhibit 3.

investigation." (Id. at 174.) The investigation eventually implicated both Ronald Allan and Howard Weissman, the Director of Facilities Management. After Anemone conferred with his supervisor, Katherine N. Lapp, the Executive Director and Chief Operating Officer of the MTA, Anemone and Lapp briefed the Manhattan District Attorney and his staff on the results of the investigation. As a result, the Manhattan District Attorney's office opened its own investigation and began coordinating further investigative work with Anemone's JITF. Allan and Weissman both pleaded guilty to State criminal charges, and I-Lite was required to pay $2 million in restitution to the MTA.

A similar investigation into Figliolia Plumbing and its principals also resulted in guilty pleas, as well as an agreement with the District Attorney to forfeit $6 million.

The Beginning of the Wood Investigation

As evidence of corruption at the MTA began to pile up, Lapp asked Anemone to "take a quiet look" at John Wood, an attorney who had provided legal services associated with MTA's location at 2 Broadway. That property's developer had been indicted in a fraud and money-laundering scheme involving $10 million, and Lapp had a "feeling" that Wood

received a substantial amount of money from billing. Dellaverson had similar suspicions.

Anemone asked Casale to investigate Wood, beginning with his billing records. Casale obtained the records from the MTA's General Counsel, Mary Mahon. But in January 2003, Lapp learned of the request for the bills and asked Anemone to come to her office. On or about January 16, 2003, Lapp met with Anemone and complained that she was not being kept adequately informed regarding the investigatory activities of the JITF. (MTA Defs.' 56.1 ¶ 30.) She told Anemone that all avenues of investigation would need to be determined and approved by her and that "drastic action" would follow if her directive was disobeyed. (Id.)

Anemone was "insulted and concerned" by Lapp's instructions. (Pl.'s 56.1 ¶ 30.) He decided to draft his letter of resignation, which read:

> It is with extreme regret that I announce my resignation from the position of Director of Security, M.T.A. After careful consideration of the comments and decisions you made at that meeting, I believe that I have no choice but to resign. To recap:
>
> 1. You indicated that the MTA would not cooperate with requests for information or documents requested by the MTA police investigators assigned to an active criminal corruption case;
> 2. You indicated that you and not I would determine which avenues of investigation would be

pursued by the personnel working under my
direction on this case;

    3. You indicated that any future requests
for MTA documents that were made without your
knowledge and permission would result in "drastic
action."

    I believe that the conclusions to be drawn
from these decisions are clear:

    1. You are improperly attempting to control
and influence the direction of a sensitive
criminal corruption case; Your direct involvement
in investigative decision making [sic] is
unprecedented and improper.

    Your order to withhold pertinent documents
form an outright lack of cooperation with the
police investigators assigned to this case and
use of threats is unprofessional, misguided and
questionable at the very least.

    I served honorably with the NYPD for over 34
years and am proud of my reputation for honesty
and high ethical standards.

    I feel that my continued association with
the MTA under the conditions enumerated above
cannot but cause me irreparable personal damage,
and allow for continued criminal activity at the
MTA.

    Truly,

(Abramson Decl., Ex. 11) (transcribed by the Court).

Anemone was working on a second draft of the letter when

Dellaverson convinced him that he would "be doing a

disservice to the MTA by leaving." (Pl.'s 56.1 ¶ 31.)

## The Beginning of the Bauer/Plasser Investigation

After conversing with Dellaverson, Anemone decided to

remain in his position. Dellaverson then communicated to

Anemone and Casale that he knew Ken Bauer, the President of

the Long Island Railroad, from the period when Bauer worked at MTA headquarters and that Bauer was a "bad guy." (Anemone Tr. at 103.) In the same conversation, Dellaverson began discussing a company called Plasser American Corp. and its business of providing special track maintenance railroad cars.

Though Dellaverson did not say that there was any connection between Bauer and Plasser, Anemone interpreted Dellaverson's remarks as an oblique request to begin an investigation. (Anemone Tr. at 145.) Anemone directed Casale to "nose around" about Bauer and Plasser. (Anemone Tr. at 149.)

And nose around Casale did. He searched publicly available documents and discovered that Plasser had previously been convicted of wrongdoing in connection with a contract between Plasser and Amtrak. (MTA Defs.' 56.1 ¶ 36.) Casale also discovered that one of the detectives "under his command at the JITF, Joseph Trimarchi, had been Bauer's driver." (Pl.'s 56.1 ¶ 37.) Trimarchi told Casale that Bauer "had been wined and dined by Plasser" and that he had dropped Bauer off at the airport for a flight to Austria "on Plasser's dime." (Id.) Based on this information, Casale formally commenced an investigation

into potential misconduct, an investigation that Casale dubbed "Operation Campfire." (MTA Defs.' 56.1 ¶ 37.)

On February 26, 2003, Anemone briefed Lapp on the existence of the Bauer/Plasser investigation. He also discovered that a contract between the MTA and Plasser was on the agenda for a vote at the MTA Board meeting the next day, Thursday, February 27. According to Anemone, he suggested to Lapp that they not raise the issue in order to protect the secrecy of the investigation. Lapp rejected the suggestion and decided to recommend to Peter Kalikow, MTA's Chairman, to pull the contract from consideration altogether. She also said that she was inclined to refer the matter to the MTA Inspector General, Matthew Sansverie, whose office was independent and had broad statutory powers to investigate any alleged misconduct within the MTA. (MTA Defs.' 56.1 ¶ 6.) Anemone was displeased, as he "had very little faith in the IG, very little trust in the IG's ability." (Anemone Tr. at 162-63.)

At the scheduled board meeting on February 27, 2003, Plasser's contract was removed from the Board's agenda. Kalikow announced that there had been "an impropriety alleged against the president of the Long Island Rail Road for receiving gifts from the Plasser Corp." (Pl.'s 56.1

¶ 46.) The disclosure was reported in the press the
following day.

<u>Lapp Refers the Investigation to Sanversie; Anemone Refuses
to Disclose the "Confidential Informant"</u>

Unbeknownst to Lapp, Anemone had already directed
Casale to contact the Queens District Attorney about the
case before the Lapp-Anemone February 27 meeting. After the
February 27 meeting, and much to Anemone's chagrin, Lapp
referred the Bauer/Plasser investigation to the Inspector
General's Office for investigation. Anemone felt slighted:
"there's that pride of ownership when you are the people
working the case from the – from day one, to have it pulled
away from you, it's somewhat of an insult." (Anemone Tr. at
162.) Nevertheless, "Casale, with Mr. Anemone's approval,"
went to the Queens District Attorney on February 28 to
pitch the investigation. (Pl.'s 56.1 ¶ 57.) Casale did not
disclose that the case was referred to the MTA OIG. He
informed representatives of the Queens District Attorney
that he had a "high level MTA official" as an informant,
one who told him that Bauer took gifts in return for
helping Plasser secure a contract with the Long Island
Railroad. (MTA Defs.' 56.1 ¶ 66.)

Maura Daly, the MTA OIG's Senior Investigator, had contacted Anemone on February 27, 2003 in an effort to commence that office's investigation into the Bauer/Plasser matter. (MTA Defs.' 56.1 ¶ 59.) However, Anemone would not disclose the source of the allegation of an improper Bauer-Plasser relationship; he simply said that he had received the information from a "confidential informant." (Anemone Mar. 27 hr'g Tr. at 31.)[9] The "confidential informant" was actually Gary Dellaverson, the man whose "hunch" about Bauer was confirmed by Bauer's driver and served as the impetus for the investigation. Anemone would later describe Dellaverson as a "community source," which he distinguished from a true "confidential informant," who, under NYPD protocol, would be expected to register with the Government.

The MTA OIG also sought the identity of the "confidential informant" from Casale. However, Casale refused to identify the source, saying only that he was a citizen of the U.S. and a resident of New York. (MTA Defs.' 56.1 ¶ 63.) After being instructed once again on March 4,

---

[9] "Anemone Mar. 27 hr'g Tr." refers to Abramson Decl., Ex. 8, which is a transcript of Plaintiff's appearance at an investigative hearing before the OIG.

that he must disclose the source, Casale said that the source was upset and refused to come forward. (Id. ¶ 69.) Casale continued the investigation, sending a detective to Philadelphia to speak with representatives from Amtrak who might have relevant information.

On March 3, 2003, Lapp contacted Anemone to instruct Casale to cooperate fully with the MTA OIG and identify his source. However, Casale continued to refuse to disclose the source until he was formally interviewed by the MTA OIG on March 27, 2003. (Id. ¶ 72.) In fact, Anemone himself refused to reveal the source to the OIG, the Queens District Attorney, or even Lapp until his deposition. (Anemone Tr. at 136-37.) In his view, he was justified in not revealing Dellaverson because of his duty to him based on their relationship as co-workers. (Anemone Tr. at 137.)

The OIG Expands its Investigation to Include Anemone

Casale and Anemone's lack of cooperation drew the particular ire of Matthew Sansverie. In a memo entitled "High Ranking MTA PD official corruption investigation," Sansverie informed his staff that "an allegation of serious misconduct has been made against the outgoing pres. of the LIRR. Hopefully this was not some reckless allegations [sic] made out of Casale's or Anemone's dislike for Bauer,

which feeling may be mutual [sic]." (Brinckerhoff Decl.,
Ex. 15.) The memo instructed the OIG staff to explore
whether Casale followed proper procedure for dealing with
confidential informants: "we need to explore in
excruciating detail whether or not Casale complied with the
rules about informants." (Id.) First Deputy Inspector
Stephen Spahr would later admit that as of March 4, 2003,
the OIG opened an investigating targeting Casale for
resisting the OIG's attempts to discover the names of his
sources. In the meantime, Bauer admitted to the OIG that he
had been entertained at the expense of Plasser American on
five occasions and that he had accepted meals at the
expense of vendors and prospective vendors to the LIRR on
dozens of occasions.

Focusing now on Anemone and Casale's creation of a
"confidential informant," the MTA OIG deposed Casale on
March 26, when he finally admitted that Dellaverson advised
him to look into Plasser American's contracts and its
association with Bauer. Casale also testified that he
received information from Trimarchi, Bauer's driver. The
following day, the OIG interviewed Anemone who corroborated
Casale's story.

<u>Anemone Goes to the New York Times</u>

In March, both Anemone and Casale believed that their employment was in jeopardy as a result of the investigation into their potential falsification of the existence of a confidential informant. (Anemone Tr. at 362-64; Casale Tr. at 207.)[10] On March 28, the day after his deposition by the OIG, Anemone reached out to two reporters from the New York Times to discuss "issues within the [Inspector General's Office and] issues within the MTA." (Anemone Tr. at 299.) At his deposition, he explained that he believed it was his "duty as a citizen as somebody, you know, responsible . . . to speak up and stop something terrible from happening." (Anemone Tr. at 321.) Anemone reported to the Times that "top-level officials at the MTA had frustrated his staff's efforts to investigate corruption within the MTA and among MTA contractors by refusing to provide essential records regarding contracts and billing, by ordering him to stop certain investigations, and by holding inquisition-style interviews with him and his deputy, Mr. Casale." (Compl. ¶ 77.) The Times ran the story based on Anemone's interview on March 30, 2003, identifying Anemone as saying that corruption by high level officials at the MTA "threatens to

---

[10] "Casale Tr." refers to the deposition of Nicholas Casale, annexed to Abramson Decl. as Exhibit 9.

undermine efforts to protect the transit system from terrorism." (MTA Defs.' 56.1 ¶ 120.)

Coincidentally, while Anemone and Casale were meeting with the New York Times reporters, Lapp discovered that the Daily News was preparing to run a story about alleged favoritism in Anemone and Casale's letting of contracts to retain the services of canine bomb-sniffing dogs. Lapp summoned Anemone to her office to discuss the potential public relations fallout – Anemone understanding full well that the article would be unfavorable to both him and Casale. (Anemone Tr. at 275-78, 284-85.)

The Interim Report

After the Times article was published, Dellaverson requested that Anemone provide all evidence regarding his belief that investigations into wrongdoing had been impeded by MTA officials. (MTA Defs.' 56.1 ¶ 122.) On March 31, 2003, Sansverie issued an "Interim Report" recommending that both Anemone and Casale's employment with the MTA be terminated. The Report, signed by Sansverie, purported to detail "acts of obstruction and intentional frustration of an MTA Inspector General's Investigation [by Anemone], aided and abetted by his Deputy and long time co-worker, Nick Casale." (Abramson Decl., Ex. 29.) The Report stated

that "[t]he actions of Anemone and Casale in this matter
evince a grave deviation from acceptable practices by two
high ranking MTA officials with the most sensitive of
duties in this post September 11 era." (Id.) It recommended
their termination because they "crossed a very important
line in police-citizen encounters, [by] fabricating a
confidential informant in order to accuse the former
President of the LIRR of misconduct." (Id.)

Sansverie, in particular, objected to the handling of
the Bauer/Plasser investigation from the beginning. On
March 12, 2003, approximately two weeks before Plaintiff's
termination, he emailed Lapp the following:

> I'm going to assume, unless I learn otherwise
> from you, that you told Lou [Anemone] at that
> Tuesday meeting [regarding Bauer] that you would
> be asking the IG to investigate this matter, not
> the PD. (Did you by any chance get explicit with
> him and advise him to cease and desist whatever
> he was doing and bring it to me?)

(Brinckerhoff Decl., Ex. 16.) Sansverie also speculated
that Anemone was avoiding service of a subpoena from his
office. (Id.) Regarding Casale's visit to the Queens
District Attorney, he added:

> I don't know when, what or who you told about the
> fact that you [Lapp] decided that I was taking
> over the investigation but it smacks of
> insubordination if someone high in the PD knew I
> was taking it over and they went to the Queens DA
> anyway three days later. As I told Gary

Dellavorson [sic], in my opinion it was an armed
coup at headquarters.

(Id.) He concluded by assuring Lapp: "By the way, I've got

your back."


The Aftermath of the Times Article

On April 1, 2003, Dellaverson placed Anemone and

Casale on paid administrative leave and requested that they

provide written responses to the Interim Report. (MTA

Defs.' 56.1 ¶ 127.) The same day, Queens District Attorney

Richard Brown issued a public statement that Anemone and

Casale had made up the existence of a confidential

informant. (Id.)

On April 11, 2003, Anemone appeared before the New

York State Assembly Standing Committee on Corporations,

Authorities and Commissions to give sworn testimony

regarding his allegations against the MTA and the MTA OIG,

where he spoke in his capacity as MTA's Director of

Security. (See generally Abramson Decl., Ex. 33.) In his

testimony, Anemone alleged that the OIG "fail[ed] to

discover and prosecute "gross corruption and fraud" by I-

Lite during a prior investigation and that Anemone's

investigators were assigned "inconsequential work []

allowing the frauds against the MTA to continue." (Pl.'s

56.1 ¶ 114.)

A few days later, on April 18, 2003, Sansverie issued a new report accusing Anemone of "questionable conduct," which he posted on the MTA website and "leaked to the press" on April 21, 2003. (Pl.'s 56.1 ¶ 115.) Dellaverson officially terminated Anemone on May 8, writing:

> [B]ased on my careful review of the information in my possession and known to me, your employment as Deputy Executive Director/Director of Security is being terminated because of your failure to perform the duties and responsibilities of your position in a satisfactory manner, including your failure to properly supervise the Deputy Director of Security.

(Abramson Decl., Ex. 37.)

Anemone's attorney sent a letter to the MTA on May 9, 2003, requesting a "name clearing hearing." (Compl. ¶ 112.) The MTA informed his attorney that Anemone's recourse for such a hearing was through an Article 78 proceeding under New York law. Anemone never filed for such a proceeding. Instead, Anemone brought this action almost two years later, serving the complaint on all defendants on or about March 24, 2005.

DISCUSSION

The turf wars, lies, leaks to the press, and bureaucracy giving rise to this lawsuit read more like the script to an episode of The Wire than the real life inner-workings of an organization with an operating budget of

over $10 billion and an average weekday ridership of over eight million people. See The MTA Network, http://www.mta.info/mta/network.htm. Mercifully, the Court's task is not to allocate blame for corruption, insubordination, or anything else; its inquiry is much more modest. The Court's task is simply to ask whether a reasonable jury could find any set of facts from which it could conclude that the MTA's termination of Anemone violated his right to free speech under the First Amendment.

I.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court's responsibility is to determine if there is a genuine issue to be tried, and not to resolve disputed issues of fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The Court must draw all reasonable inferences and resolve all ambiguities in the nonmoving party's favor, and construe the facts in the light most favorable to the nonmoving party. Id. at 254-55. However, summary judgment

may be granted "[i]f the evidence is merely colorable, or is not significantly probative." Id. at 249-50 (citations omitted).

The party seeking summary judgment bears the burden of showing that no genuine factual dispute exists. See Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995). Once the moving party has made a showing that there are no genuine issues of material fact, the burden shifts to the nonmoving party to raise triable issues of fact. Anderson, 477 U.S. at 250. A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the nonmoving party. Id. at 248.

II. No Reasonable Jury Could Find That Anemone Was Terminated In Violation Of His First Amendment Rights

Whether public employee speech is protected from retaliation under the First Amendment "entails two inquiries: (1) whether the employee spoke as a citizen on a matter of public concern and, if so, (2) whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008) (quotations and internal citations omitted). Assuming arguendo that Anemone has met

the first requirement,[11] the Court finds that the MTA had an

"adequate justification" in terminating him because, on

this record, a reasonable jury could not find that the MTA

terminated him for "exposing corruption" within the

organization, that is, for speaking out on a matter of

public concern.

## A. Standard for Making Out a Prima Facie Claim

"In order to survive a motion for summary judgment on

a First Amendment retaliation claim, a plaintiff must bring

forth evidence showing that he has engaged in protected

First Amendment activity, he suffered an adverse employment

---

[11] Former Chief Judge Michael B. Mukasey, who was originally
assigned this case, has already held that the subject
matter of Anemone's speech constituted a matter of public
concern. Anemone v. Metro. Transp. Auth., 410 F. Supp. 2d
255, 265 (S.D.N.Y. 2006) (Mukasey, J.) ("Anemone I")
("Speech relating to public corruption and/or a public
entity's failure to adequately or properly investigate such
corruption [constitutes] protected expression."). The Court
will not revisit this issue. See Sanders v. Sullivan, 900
F.2d 601, 605 (2d Cir. 1990) ("Under the law of the case
doctrine, this court adheres to its own decision at an
earlier stage of the litigation unless there are cogent or
compelling reasons not to, such as an intervening change of
controlling law, the availability of new evidence, or the
need to correct a clear error or prevent manifest
injustice.") (internal quotation marks and citation
omitted). Furthermore, for the purposes of this motion, the
Court will assume that Anemone was motivated, at least in
part, by genuine concern about corruption within the MTA,
as opposed to having any sort of personal vendetta. See,
e.g., Reuland v. Hynes, 460 F.3d 409, 418 (holding that
"the speaker's motive is not dispositive as to whether an
employee's speech relates to a matter of public concern").

action, and there was a causal connection between the protected activity and the adverse employment action." Dillon v. Morano, 497 F.3d 247, 251 (2d Cir. 2007) (internal citations omitted). Ordinarily a plaintiff has the burden of proving that his protected conduct played only a "substantial or motivating" in the termination decision in order to make a prima facie case under the framework established in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 287 (1977). However, in those retaliation cases where "plaintiff's conduct is a unitary event that could prompt either a permissible or an impermissible reason on the part of the defendant to act," the mere fact that a protected act was the but-for cause of termination is insufficient. See Greenwich Citizens Comm., Inc. v. Counties of Warren & Washington Industrial Development Agency, 77 F.3d 26, 33 (2d Cir. 1996) ("In cases involving unitary events, claims of alleged retaliation for the exercise of a constitutional or statutory right require focusing precisely on whether the defendant acted for an impermissible reason, and not merely in response to the plaintiff's conduct. This is so where the defendant does not dispute that it acted in response to the plaintiff's conduct, but asserts that its response was prompted by a legitimate reason, not an

impermissible one."); see also id. at 31 ("[T]he Supreme
Court held that, under certain circumstances, the State may
act adversely with respect to (what turns out to be)
protected speech, so long as it does so without any intent
to retaliate for the exercise of First Amendment rights.")
(citing Waters v. Churchill, 511 U.S. 661 (1994)). Thus the
plaintiff, as part of the prima facie case, must bring
forth evidence that the adverse employment decision was
motivated by an impermissible reason. Greenwich Citizens
Comm., 77 F.3d at 33; see also Scott v. Coughlin, 344 F.3d
282, 288 (2d Cir. 2003) ("Plaintiff has the initial burden
of showing that an improper motive played a substantial
part in defendant's action."); cf. 1 Martin A. Schwartz,
Section 1983 Litigation: Claims and Defenses § 3.11[C], at
3-352 (4th ed. 2003) (noting that only after a public
employee demonstrates that her statements were of public
concern and that the employer had an improper motive does
the court ask whether interference with governmental
operations outweighs the employee's First Amendment
rights).

B.  <u>Temporal Proximity Is Ordinarily Sufficient
    Circumstantial Evidence of an Impermissible
    Retaliatory Motive to Create a Genuine Issue of
    Material Fact</u>

Plaintiff's theory of this case is fairly
straightforward: because he went to The New York Times on
March 28 in an exercise of his First Amendment right to
expose corruption at the MTA and the decision to suspend
and then terminate him followed shortly thereafter, a
reasonable jury could infer that he suffered an adverse
employment decision <u>because</u> of his protected speech to The
Times. Indeed the <u>only</u> evidence of any <u>improper</u> retaliatory
motive on the part of any Defendant is the fact that
Anemone's suspension occurred on April 1, only three days
after the publication of the New York Times article.

Viewed in isolation, the temporal proximity between
Anemone's speech and the adverse employment action might be
sufficient to create a triable issue of fact on the
government employer's motive. <u>See, e.g.</u>, <u>Slattery v. Swiss
Reinsurance Am. Corp.</u>, 248 F.3d 87, 95 (2d Cir. 2001)
(noting that temporal proximity can demonstrate causal
nexus). Temporal proximity is usually sufficient to
generate issues of fact because it is strong circumstantial
evidence of improper intent. <u>See, e.g.</u>, <u>Chertkova v.
Connecticut Gen. Life Ins.</u>, 92 F.3d 81, 87 (2d Cir. 1996)

(noting that circumstantial evidence is often the only available means to prove retaliation claims). The Court is mindful that in retaliation cases, "employers are rarely so cooperative as to include a notation . . . that the firing is for a reason expressly forbidden by law." <u>Ramseur v. Chase Manhattan Bank</u>, 865 F.2d 460, 464-65 (2d Cir. 1989) (quotation omitted).

C.  <u>Dellaverson Was the Final Decisionmaker, and Thus Only an Improper Motive (Actual or Imputed) on His Part Would Result in a First Amendment Violation</u>

Despite the inference of impermissible motive that arises from temporal proximity in most cases, retaliation cases are not <u>sui</u> <u>generis</u>. In order to avoid summary judgment, a plaintiff retains the obligation to demonstrate the existence of a triable issue of material fact. Of particular relevance here, the Court of Appeals has never held that temporal proximity, in and of itself, is <u>necessarily</u> <u>sufficient</u> to create a genuine issue of

material fact in every case.[12]

The existence of multiple actors complicates this inquiry somewhat, and Plaintiff errs here in conflating the motives of this group of Defendants by imputing evidence of the allegedly illicit motives of some to the others. The "MTA" did not decide to terminate Anemone's employment; one particular individual within the MTA did--Gary Dellaverson. It is uncontested that Lapp delegated the authority to make a final decision on Anemone's employment to Dellaverson, and Kalikow had no role in the termination decision whatsoever. (Lapp Tr. at 187; Dellaverson Tr. at 249-50; MTA Defs. 56.1 ¶ 3.)[13] Plaintiff relies heavily on the fact that in the wake of the Times article "exposing" corruption within the MTA, Inspector General Sansverie accelerated the Interim Report critical of Anemone, a report that was

---

[12] Indeed the Court of Appeals for the Seventh Circuit has explicitly held that timing alone is insufficient to establish a genuine issue of material fact to support a retaliation claim. Spring v. Durflinger, Nos. 06-2168, 06-2516, 2008 WL 540220, at *6, (7th Cir. Feb. 29, 2008); see also Stone v. City of Indianapolis Pub. Utils. Div., 281 F.3d 640, 644 (7th Cir. 2002) ("[M]ere temporal proximity . . . will rarely be sufficient in and of itself to create a triable issue.").

[13] "Lapp Tr." refers to the deposition of Katherine Lapp, annexed to Abramson Decl. as Exhibit 2. Additionally, in response to the Court's question at oral argument about who the decisionmaker was regarding Anemone's employment, Plaintiff's counsel did not contest Defendants' counsel's representation that it was Dellaverson.

already being composed prior to the appearance of the
article. (See Pl.'s Mem. at 45-54). However, even if that
conduct amounted to evidence of a retaliatory motive on the
part of Sansverie, it does not necessarily follow that such
a motive can then be imputed to Dellaverson. While
Dellaverson acknowledged that he considered the report as
one factor in the ultimate decision, it is also clear that
he exercised independent judgment in terminating Anemone
from his position.[14]

The exercise of independent judgment can "break the
chain of causation," curing any supposed constitutional
violation, in the absence of evidence that the subordinate
"misleads" or "pressures" the final decisionmaker. See Wray
v. City of New York  490 F.3d 189, 193 (2d Cir. 2007) ("In
the absence of evidence that Officer Weller [the
subordinate] misled or pressured the prosecution or trial
judge [the relevant decisionmaker in the Section 1983
action], we cannot conclude that his conduct caused the
violation of Wray's constitutional rights; rather, the
violation was caused by the ill-considered acts and
decisions of the prosecutor and trial judge.").

---

[14] See, e.g., Dellaverson Tr. at 253 ("My decision to
terminate Anemone was predicated upon any number of things
that included the Inspector General's report . . .").

Thus only Dellaverson's motives are relevant in determining whether there was a causal connection between Anemone's protected speech and his termination. As set out in detail below, on this record, a reasonable jury could not find that Dellaverson had an <u>improper</u> motive in terminating Anemone. This is because (i) Anemone had a long history of disruptive and insubordinate behavior culminating in his speech to The Times, and because (ii) whatever inference of retaliation arises from temporal proximity is defeated by Dellaverson's active role in both initiating and conducting corruption investigations at the MTA.

 (i) <u>Anemone's History of Disruption and Insubordination</u>

  1. <u>Failure to Supervise Casale</u>

Dellaverson's stated reason for terminating Anemone was his general "failure to perform [his] duties in a satisfactory manner." (Abramson Decl., Ex. 37.) Receiving special mention was Anemone's failure to supervise Casale. (<u>Id.</u>) Casale, who was hired at the behest of Anemone, was a disruptive employee from the very beginning of his tenure. Lapp received numerous complaints from other employees within the MTA about Casale's inability to "interact" with people, a "lot of displeasure about his demeanor" and his

having threatened a member of the Legal Bureau with termination if the member failed to comply with Casale's request. (Lapp Tr. at 78-80.) Lapp was especially troubled by a complaint from Dan Castleman, an Assistant District Attorney in Manhattan, that Casale was interfering with an investigation by that office.[15] Lapp rebuked Anemone for Casale's conduct. (Lapp Tr. at 125.)

There were also complaints about Casale within the MTA, from MTA legal staff, Chairman Peter Kalikow, and the head of the MTA Police Union. (Lapp Tr. at 78-79, 80-82, 100). Kalikow himself had received complaints about Casale's "inappropriate" behavior. (Kalikow Tr. at 92.)[16] Dellaverson received similar complaints, including complaints about Anemone's failure to supervise Casale satisfactorily. (Dellaverson Tr. at 214-15, 220-21.) In the face of these complaints, Anemone defended Casale's behavior and never conducted his own investigation of the complaints against Casale. (Anemone Tr. at 75-78.)

---

[15] See Lapp Tr. at 124 (describing how Castleman was "quite upset" because Casale was "undertaking his own investigation, in direct contravention to what their investigation was").

[16] "Kalikow Tr." refers to the transcript of Peter Kalikow, annexed to Abramson Decl. as Exhibit 1.

Casale was also the subject of several internal investigations. He was investigated by the MTA Internal Affairs Bureau concerning the improper use of a police database of confidential data. (Casale Tr. at 259-61.) In addition, he was investigated for failing to report an accident while driving an MTA vehicle. (Casale Tr. at 183-84; Anemone Tr. at 196-97.) Anemone took no steps to discipline Casale for any of the conduct giving rise to these investigations.

2.    Other Insubordination and/or Disruption by Anemone

Anemone's relationship with Lapp was also disruptive within the MTA. The January 16, 2003 meeting, prompted by the phone call from Castleman, was quite acrimonious. Lapp's directive to clear all avenues of investigation through her was backed up by the threat of "drastic action" if it was disobeyed. (Anemone Tr. at 46-47.) This prompted Anemone to draft a resignation letter decrying Lapp's "interference" with a police investigation. (See Abramson Decl., Ex. 11)("You indicated that you and not I would determine which avenues of investigation would be pursued by the personnel working under my direction on this case.")

This pattern continued with Anemone's ignoring Lapp's February 26, 2003 directive to cease investigating the

Bauer/Plasser matter that had been referred to the OIG. Anemone disagreed with Lapp's decision at the time and tried to keep the case with JITF, but Lapp refused to change her mind. (Anemone Tr. at 160-64.) Nevertheless, Anemone allowed Casale to pitch the investigation to the Queens District Attorney's Office anyway. (Anemone Tr. at 353) ("Q: [Y]ou thought it was okay for Mr. Casale to go ahead and have a meeting with the Queens DA, even though Ms. Lapp had instructed you to instruct Mr. Casale to halt the investigation? A: Yes.")

Finally, even assuming that Anemone truly believed that Dellaverson was a "confidential informant," it is clear from the record that he was uncooperative with the OIG investigation from the outset. He intentionally took steps to frustrate the OIG's investigation into the Bauer/Plasser matter by concealing that Dellaverson was the source of the allegation of the existence of an improper relationship. (See Anemone Tr. at 171.) Putting to one side the question of whether Anemone was justified in "protecting his source," his actions nevertheless still constituted insubordination from the perspective of the MTA and the OIG.

### 3. The Disruptive Character of Anemone's Speech in The Times

It is only in this context that Anemone's speech to The Times can be understood as constituting one of the rare cases where there is a "unitary act" that could prompt either a permissible or impermissible response from the government employer. See Greenwich Citizens Comm. 77 F.3d at 33. The impermissible ground upon which Dellaverson could have terminated Anemone was to punish Anemone for his speech qua protected speech i.e., for exposing corruption or any accompanying cover-up. However, in making his decision, Dellaverson was permitted to take into account the disruptive character of Anemone's speech to The Times, and the record demonstrates that he did just that.

Besides the general dissatisfaction with Anemone's performance cited in the termination letter (and specifically his failure to supervise Casale), Dellaverson testified that he found Anemone's discussion to the reporters from The Times objectionable not because it exposed "corruption" within the MTA, but because Anemone's accusations of a "cover up" were both baseless and because they were "colored" with the notion that MTA customers were somehow at greater risk of terrorist attack as a result of the alleged corruption:

Q: Insofar as Mr. Anemone discussed certain issues with [T]he New York Times and that they were reported in whatever manner they were reported that Sunday the 31st of March 2003, what aspect of that had any influence on your decision to terminate him?

A: The fact that the allegations themselves were baseless, in other words, the allegations that the organization, MTA had thwarted his attempt to uncover corruption, just in sum.

That the allegations were baseless, <u>that he colored them with this notion that the MTA customers were at risk to terrorist attack, or more at risk than they would otherwise be</u> because of those baseless allegations, and the fact that he chose to find as a way to articulate those allegations a newspaper report rather than attempting to find some more appropriate way to air his complaints.

(Dellaverson Tr. 254-55) (emphasis added.) In so testifying, Dellaverson emphasized that his consideration of Anemone's statement that the actions complained of put MTA customers at greater risk of terrorist attack was entirely separate from other considerations. In a series of questions regarding the basis for Dellaverson's decision to terminate Anemone, Dellaverson cited "Anemone's loss of [the] confidence of [Dellaverson] and Ms. Lapp, his failure to follow [Lapp's] direction, [and] his failure to supervise Mr. Casale." (Dellaverson Tr. at 253.) Dellaverson was also examined closely about the effect of the Times article. (Dellaverson Tr. at 253-260). It was in

the context of discussing that the facts reported by
Anemone to The Times were baseless that Dellaverson
distinguished clearly between the baselessness of the facts
and his concern about Anemone's connecting those facts to a
lack of security of MTA customers.  He said:

> [Anemone and Casale] knew those facts and
> yet notwithstanding being privy to, knowing,
> their own personal knowledge, chose to
> misrepresent that in a fallacious fashion to the
> reporters in order to make this connection that
> the organization, right, was not adequately
> securing itself for its customers.
>
> That is separate from simply the baseless
> portion of the allegations.
>
> In other words, I see those two things, I at
> least see those two things as separate from one
> another.

(Dellaverson Tr. at 260) (emphasis added).


Disruption to the workplace is a permissible reason
for termination. See, e.g., McEvoy v. Spencer, 124 F.3d 92,
103 (2d Cir. 1997) (disruption to the public workplace
resulting from the critical speech of an employee is an
acceptable reason for termination even if the employee had
a First Amendment right to speak out). In Locurto v.
Giuliani, for example, the Court of Appeals concluded as a
matter of law that the mayor was justified in terminating
police officer and firefighter employees for what would

otherwise be protected racist speech because the Government may "legitimately regard as 'disruptive' expressive activities that instantiate or perpetuate a widespread public perception of police officers and firefighters as racist." 447 F.3d 159, 178 (2d Cir. 2006).

Here, Anemone's suggestion that the MTA was somehow vulnerable to terrorist attacks because, for example, it was unwilling to investigate the Bauer/Plasser matter is not plausible. In making the employment decision, however, Dellaverson was permitted to take into account the effect that Anemone's vulnerability statement would have on the public's perception of the MTA. Just like in Locurto, Dellaverson concluded that Anemone's making statements to The Times about the MTA's vulnerability to terrorist attacks was not only an act of insubordination (and hence disruptive to the workplace), but it was also disruptive because it instantiated and perpetuated a widespread public perception of vulnerability to attack. Consequently, even if Anemone's speech to The Times was the "but-for" cause of Dellaverson's decision to terminate Anemone, on this record, that does not in itself constitute a violation of Anemone's First Amendment rights because he based the decision on the disruptive effect of Anemone's vulnterability statement, and, as noted above, the Court of

Appeals has held that the critical inquiry in First Amendment retaliation cases is the existence of an impermissible motive. See Greenwich Citizens Comm., 77 F.3d 26, 33 (2d Cir.1996) ("In these situations, 'protected conduct'" does not necessarily equal 'impermissible reason,' and if the test of 'but for' causation is phrased in terms of the impact of the 'protected conduct,' then this phrase becomes an inadequate proxy for the proper inquiry into whether the defendant acted with retaliatory intent.").

(ii) Dellaverson's Role in Corruption Investigations

Turning, then, to the question of whether there is proof in the record of such an impermissible motive, Plaintiff's case rests entirely on the inference of retaliation that arises from temporal proximity between the termination decision and the Times article. On this record, it is simply not plausible to ascribe to Dellaverson an impermissible motive, viz., the desire to punish Anemone for making public any graft within the MTA, because Dellaverson himself was either the origin of, or at least an active participant in, every corruption investigation undertaken by Anemone from the beginning of his tenure with the MTA.

The I-Lite investigation was conducted pursuant to
"somewhat regular conversations and interactions" between
Anemone and Dellaverson. (Dellaverson Tr. at 171.) That
investigation resulted in a very public prosecution by the
Manhattan District Attorney's office, with the prosecutor's
announcing guilty pleas of the I-Lite principals and a $2
million restitution agreement with the company. (MTA Ans.
¶ 46.)

After the I-Lite investigation, Dellaverson explicitly
encouraged Anemone to investigate the plumbing contractor
Figliolia because of his suspicions about overbilling.
(Dellaverson Tr. at 183.) As a result of that
investigation, sufficient evidence had been gathered to
allow the MTA to terminate Weissman and his deputy Ronald
Allan's employment at the MTA (MTA Ans. ¶ 46.) In September
2004, three of the principals of Figliolia Plumbing pleaded
guilty to racketeering charges and agreed to pay $6 million
in restitution. This too was no secret. The Manhattan
District Attorney issued a press release describing the
disposition of the case on September 22, 2004.
(Brinckerhoff Decl., Ex. 11.)

Next, the Wood investigation, which would set into
motion the events that eventually led to Anemone's
termination, began at the request of both Lapp and

Dellaverson. Dellaverson told Anemone that he found Wood "to be an uncomfortable presence," that Wood "seemed like a secretive guy" who "caused me some apprehension." (Dellaverson Tr. at 158-63.) It was during the course of this investigation that Lapp confronted Anemone about his not keeping her sufficiently apprised of the investigation and threatening to take "drastic action if any request for documents were ever made without her knowledge." (Anemone Tr. at 46.) This confrontation caused Anemone to draft his resignation letter, and it was Dellaverson who persuaded Anemone that he would "be doing a disservice to the MTA by leaving." (Anemone Tr. at 42.)

Finally, the Bauer/Plasser investigation was born out of Anemone's suspicions regarding Plasser's business of providing special maintenance railroad cars. At his deposition, Anemone himself testified that:

> My conversations with Mr. Dellaverson were of
> such a nature that we both understood quite
> clearly what he was telling us about Bauer, the
> direction he was steering us to go look. This
> whole idea of me [sic] protecting him, not having
> to tell him, because he knew he was the guy that
> was - and this wasn't the only occasion he had
> given us information to start an investigation.
> It was from his lips that Figliola Plumbing was
> first mentioned to me. No one else. What the hell
> did I know about Figliola Plumbing?

(Anemone Tr. at 145.) Anemone continued to brief Dellaverson on the progress of the Bauer/Plasser

investigation, bringing him up to date, for example, on investigative devlopments involving Plasser's relationship with Amtrak and the British Transport Police. (Anemone Tr. at 118-19.)

To summarize, Dellaverson played an integral part in advancing all four corruption investigations undertaken by Anemone and Casale, the first three of which were widely publicized. Regarding the Bauer/Plasser investigation, Anemone described Dellaverson was "the puppet master pulling the strings, and one end was [Casale], and on the other one was [Anemone], and Gary [Dellaverson] was making the decisions." (Anemone Tr. at 147.) Yet Plaintiff asks the Court to believe that "Defendants fired Louis Anemone because he would not stop publicizing his corruption investigations at the MTA." (Pl.'s Mem. at 29.) Whatever force there is to the inference of such an intent based on the temporal proximity between the Times article and the termination, that inference is entirely defeated by the fact that Dellaverson (and Lapp) initiated these very investigations, all of which were public knowledge before

the fallout with Anemone.[17]

Therefore, because Anemone can only prevail on his retaliation claim if Dellaverson harbored some improper intent and because no reasonable factfinder could reach that conclusion based on this record, Defendants are entitled to summary judgment.

III. **Alternatively, No Reasonable Jury Could Fail to Find that Anemone Would Have Been Terminated Regardless of His Speech to The Times**

Again assuming _arguendo_ that Plaintiff's speech was protected, a government employer is still entitled to prevail if it can prove that it would have reached the same decision absent the protected conduct under the governing Mt. Healthy framework. See Heil v. Santoro, 147 F.3d 103, 110 (2d Cir. 1998). It is uncontested that Plaintiff engaged in numerous examples of insubordination. As set forth above, for example, Anemone (1) pitched the Plasser investigation to the Queens District Attorney without Lapp's knowledge and despite her explicit instructions not to engage in such behavior, (2) refused to identify the

---

[17] Thus, even if the Court did not conclude that Dellaverson's motives were the only relevant motives for the purposes of this motion (See Section II C.), the same reasoning would preclude finding any impermissible intent on the part of Lapp, who had the ultimate authority to terminate Plaintiff.

"community source" in response to OIG inquiries, and (3) failed to discipline Casale for continuing to investigate Plasser against Lapp's instructions, despite the fact that Casale may have done so "deliberately." (See also MTA Defs.' 56.1 ¶ 70.) As set out above in Section II C(i), Anemone's "failure to perform [his] duties in a satisfactory manner, including his failure to supervise Casale," (Abramson Decl., Ex. 37), was the stated basis for Anemone's termination, and he does not dispute the underlying facts.

Furthermore, Anemone suspected that he was likely to be terminated before he decided to go to The Times. (See Anemone Tr. at 362-63) (acknowledging his belief that his job was in jeopardy based on the questions he received from the OIG). Because Anemone's speech to The Times took place well after the investigation into his insurbordinate and disruptive conduct had begun, any inference of retaliatory motive is diminished. See, e.g., Benvenisti v. City of New York, No. O4 Civ. 3166, 2006 WL 2777274, *15 (S.D.N.Y.,2006) ("The plaintiff did not make this threatened complaint until December 17, 2002, well after a well-documented series of progressive disciplinary measures. Therefore, the plaintiff here is not entitled to an inference of causation based on temporal proximity.").

On this record, a reasonable jury could not fail to find that Anemone would have been terminated by Dellaverson absent his speech to The Times. For this reason, summary judgment for Defendants is also appropriate.

IV.  Plaintiff's Remaining Arguments

Plaintiff also argues that Anemone's conversation with the Queens District Attorney and testimony before the State Assembly could form the basis of his retaliation claim. (Pl.'s Mem. at 30.) The Court's discussion of the absence of evidence of a retaliatory motive applies to these claims as well. However, these instances of speech are also barred by Garcetti v. Ceballos, which held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. 410, 426 (2006). While Anemone was technically suspended when he spoke before the State Assembly, he nevertheless was acting pursuant to his "official duties" relating to security. Indeed he described himself as the

current . . . Deputy Executive Director and Director of Security for the MTA."[18]

Finally, Plaintiff brings a "stigma-plus" claim, arguing that the Interim Report stigmatized him without affording him due process. (Pl.'s Mem. at 54-75.) However, the Court has recently concluded, along with numerous other courts, that the availability of an Article 78 proceeding under New York law constitutes adequate post-deprivation process. <u>Glicksman v. New York City Envtl. Control Bd.</u>, No. 01 Civ. 4048, 2008 WL 282124, at *4 (Jan. 25, 2008 S.D.N.Y.). Precisely the same reasoning applies to this case.

---

[18] <u>See</u> Compl. ¶ 94; <u>see</u> <u>also</u> Abramson Decl., Ex. 33 (Anemone's testimony before the Assembly Committee).

V.   Conclusion

In cases where questions of intent predominate, summary judgment is ordinarily not appropriate. However, the unusual facts of this case are such that no reasonable jury could conclude that Plaintiff was terminated for an impermissible reason. Consequently, Plaintiff's First Amendment rights were not violated when he was terminated. Defendants' motions for summary judgment [dkt. nos. 43, 49] are GRANTED.

The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED:

Dated:     New York, New York
           May **2** , 2008

LORETTA A. PRESKA, U.S.D.J.